[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**
**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**JULY 18, 2003**
**THOMAS K. KAHN**
**CLERK**

_____

No. 02-14156

_____

D.C. Docket No. 99-01426-CV-ORL-22A

FLY FISH, INC., a Florida corporation,
d.b.a. Sassy Merlot's 2,

Plaintiff-Appellant-
Cross-Appellee,

versus

CITY OF COCOA BEACH, a Florida
municipal corporation,

Defendant-Appellee-
Cross-Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

**(July 18, 2003)**

Before DUBINA, HILL and COX, Circuit Judges.

HILL, Circuit Judge:

Fly Fish, Inc. appeals the entry of summary judgment against it on its First Amendment challenge to various provisions of the adult entertainment ordinance of the City of Cocoa Beach, Florida. The City of Cocoa Beach, Florida appeals the entry of summary judgment against it as to one of the licensing provisions of that ordinance. For the following reasons, we affirm in part and reverse in part.

## I.

The City of Cocoa Beach, Florida (the "City" or "Cocoa") consists of 4.17 square miles running along the east coast of central Florida in a narrow strip. It is approximately six miles long. Most of the City is only one mile wide.[1] The City has a population of 13,263 permanent residents and a peak tourist population of 10,000-11,000. It is comprised of a total of 2,672 acres. Of that, 154 acres are designated and zoned for general commercial use, 954 acres are allotted for single and multi-family residential use, and approximately one third (900 acres) is designated for conservation. Currently, there are 1.71 acres on which adult businesses may legally operate.

---

[1]Although at one point the city is two miles wide, over one-third of the City's land mass is less than two thousand feet wide.

The City first enacted an adult entertainment ordinance in 1986. At that time, there were three adult entertainment establishments in existence. In 1997, Fly Fish, Inc. ("Fly Fish") established a club named "Sassy Merlot's 2" ("Sassy's") at the location of a former dance club that was not an adult entertainment business. Sassy's was issued the former club's license to operate a dance club, but, soon after it opened, it instituted an "adult entertainment" format, although it did not fall within the definition of such an establishment as set out in the City's code.[2]

In 1999, the City passed a revised adult entertainment ordinance, Ordinance 1204 (the "ordinance" or "1204"), that redefined an adult entertainment establishment to include one in which the dancers dance for tips or in close proximity to the patrons. Under Ordinance 1204, Sassy's effectively became an adult entertainment establishment, and it applied for an adult entertainment license.

Ordinance 1204, however, makes only three sites available for adult businesses. These sites are defined by the legal descriptions of the lots at which the other three adult entertainment establishments were then operating. Therefore,

---

[2]At the time it instituted this format, the City's ordinance defined adult entertainment by the anatomical areas exposed.

there was no site available to which Sassy's could relocate.[3] Presumably for this reason, no license issued. We do not know for sure since the City never formally denied the application. Instead, the City followed the provisions of Ordinance 1204, which provide that if no action is taken on an application within thirty days, a license must issue and the applicant is entitled to operate under that "temporary" license until such time as the City formally acts on the application. Sassy's has operated in this fashion until the present time.[4]

Ordinance 1204 is a three-pronged regulation of adult-entertainment establishments. First, it regulates conduct, proscribing total nudity on the part of the employees of such establishments.[5] Second, it is a zoning statute, limiting the location of adult entertainment establishments. Finally, it is a licensing statute, establishing criteria for the issuance of a business license and imposing a licensing fee.

---

[3] The only provisions in the City Code that specify the locations of adult businesses are those contained in Ordinance 1204.

[4] The ordinance also requires all non-conforming use of city property to close by September of 2002. Sassy's has been granted various extensions, but must close by September 2, 2004, if it remains non-conforming, which, by definition, it must.

[5] As is common in adult entertainment ordinances, 1204 defines "nudity" as the exposure of "specified anatomical areas," specified as genitalia, buttocks and female breasts. G-strings and pasties are sufficient to avoid application of the statute.

4

Fly Fish attacks each prong of Ordinance 1204. First, it argues that as a regulation of conduct, 1204 unconstitutionally suppresses conduct protected by the First Amendment. If so, the ordinance is subject to strict scrutiny, and the district court erred in applying a lesser standard of review.[6]

Second, Fly Fish claims that, as a zoning statute, Ordinance 1204 fails to pass constitutional muster because it provides too few opportunities for adult entertainment establishments.

Third, Fly Fish contends that the licensing provisions of the ordinance are unconstitutional because they vest unbridled discretion over the licensing decision in city officials and impose a licensing fee that constitutes a tax on expressive conduct.

The district court entered summary judgment for the City on the first two of Fly Fish's attacks on the ordinance, as well as the claim that the licensing fee is unconstitutional. The court entered summary judgment for Fly Fish, however, on its claim that the ordinance's licensing provisions grant the City unconstitutional discretion over the licensing decision. Both parties appealed. We review these

---

[6]Actually, we do not know what level of scrutiny the district court applied to Ordinance 1204 because it summarily dismissed the claim that it was content-based. We assume, however, that it did not strictly scrutinize the statute without comment.

judgments *de novo*.  *Calhoun v. Lillenas Publishing*, 298 F.3d 1228 (11th Cir. 2002).

II.

1.  ***Ordinance 1204 As a Regulation of Expressive Conduct***

Fly Fish claims that Ordinance 1204's prohibition on nudity in adult entertainment establishments must be strictly scrutinized because it is a content-based regulation of expressive conduct.  If so, the district court erred in not doing so.

   1.  <u>Regulations of Expressive Conduct</u>

The Supreme Court has identified three categories of laws that regulate conduct with an expressive component.  In order to determine what level of scrutiny is due Ordinance 1204, we must first decide into which category it fits.

   *a)*     *Content-neutral Regulations*

First, there are laws of general application that serve purposes unrelated to the content of expression.  These content-neutral laws prohibit an entire class of conduct, and do not define the regulated conduct with reference to any expressive content it may have.  Such a law is entitled to a deferential, or intermediate, level of constitutional scrutiny.  *United States v. O'Brien*, 391 U.S. 367, 382 (1968).

6

A general prohibition of public nudity is a law of general application. *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566 (1991) (plurality opinion). It prohibits an entire class of conduct, and does not define the regulated conduct with reference to any expressive component. *Id.* at 570-571. Therefore, it is content-neutral on its face. *Id.*

Nor does the application of the statute to expressive conduct – nude dancing – render the statute content-based. *Id.*[7] So long as the purpose of the statute is unrelated to the suppression of the expressive conduct, the statute is content-neutral. *Id.* ("The perceived end that [the statute] seeks to address is not erotic dancing, but public nudity"); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("[I]n determining content neutrality, . . . [t]he government's *purpose* is the controlling consideration") (emphasis added). A general prohibition of public nudity, even as applied to nude dancing, therefore, is content-neutral and reviewed under intermediate level of scrutiny. *Barnes*, 501 U.S. at 568.[8]

---

[7]The Supreme Court has recently reaffirmed that nude dancing of the type at issue here is expressive conduct that falls within the outer ambit of the First Amendment. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000) (citing *Barnes v. Glen Theater, Inc.*, 501 U.S. 560, 565-566 (1991) (plurality opinion).

[8]Under *United States v. O"Brien*, 391 U.S. 367, 376-377 (1991) an ordinance satisfies the First Amendment if it is within the constitutional power of the government to enact; furthers a substantial government interest that is unrelated to the suppression of free expression; and is no more restrictive than necessary to further the governmental interest.

Recently, the Court reaffirmed that a ban on public nudity is a content-neutral law of general application due intermediate scrutiny. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289-290 (2000). In *Erie,* the Court upheld an ordinance prohibiting public nudity as applied to nude dancing because the ordinance was a law of general application, prohibiting the entire class of nude conduct. *Id.* The Court rejected the charge that the ordinance was content-based, observing that it was "a *general* prohibition on public nudity," which:

> [b]y its terms, . . . regulates conduct alone. It does not target nudity that contains an erotic message; rather, it bans all public nudity, regardless of whether that nudity is accompanied by expressive activity.

*Id.* at 290.[9]

### b) Content-based Regulations

On the other hand, a law that proscribes or limits conduct precisely because of its expressive component is content-based. *Texas v. Johnson*, 491 U.S. 397, 403 (1989). These regulations draw strict scrutiny because they are aimed at the *suppression* of free expression. *Johnson*, 491 U.S. at 403. Under this test, such an ordinance is presumptively invalid, and, if it suppresses protected speech "because

---

[9]The Court repeatedly referred to the "general" application of Eries' ordinance, noting that "Erie's ordinance is on its face a content-neutral restriction on conduct," *id.* at 296, and "it is worth repeating that Eire's ordinance is on its face a content-neutral restriction that regulates conduct, not First Amendment expression," *id.* at 298.

8

of disagreement with the message it conveys," it violates the First Amendment, absent some compelling state interest in its enforcement. *Ward,* 491 U.S. at 791. A law that prohibits nude dancing because of disapproval of its expressive content is unconstitutional. *Barnes*, 501 U.S. at 570-571.

### c)     Content-Based Regulations Treated as Content-Neutral

The Supreme Court has identified a third category of regulation of expressive conduct. *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41 (1986). These regulations define the regulated conduct by its expressive content, and, to this extent, they are "content-based." *Id.* at 47. Their purpose, however, is not to ban the expressive conduct, but merely to establish restrictions on the time, place, and manner of its presentation. *Id.* at 46. Although content-based, such a regulation will be treated as if it were content-neutral if it serves a substantial government purpose that is unrelated to the suppression of the expressive conduct. *Id.* at 47-49.

In the context of adult entertainment, the Court held that this purpose can be located in combating the harmful secondary effects of that conduct on the surrounding community. *Id.* at 49. In *Renton*, the Court upheld an ordinance that targeted adult theaters. *Id.* at 47. The Court rejected the argument that such an ordinance is necessarily aimed at the content of the films shown there, holding that

"[t]he ordinance by its terms is designed to prevent crime, protect the city's retail trade, maintain property values, and generally 'protec[t] and preserv[e] the quality of [the city's] neighborhoods, commercial districts, and the quality of urban life,' not to suppress the expression of unpopular views." *Id.* at 48 (quoting unpublished district court's opinion in *Renton*). Thus, although discriminatory, the ordinance was entitled to be treated as a content-neutral regulation because it was justified without reference to the content of the regulated conduct. *Id.*

Under *Renton*, such a content-based, but treated as content-neutral, regulation of expressive conduct is entitled to an intermediate level of scrutiny. *Id.* at 49. It survives this scrutiny so long as it is designed to serve a substantial government interest and leaves available ample alternative avenues of communication. *Id.* at 50.

2.    Ordinance 1204: A Constitutional Orphan?

Ordinance 1204 does not fit neatly into any of these three categories. Unlike the laws upheld in *Barnes* and *Erie*, Ordinance 1204 is not a law of general application. It prohibits nudity only in adult entertainment establishments. It does not prohibit public nudity anywhere else in Cocoa Beach.[10] Although no worker in an adult entertainment establishment in Cocoa Beach may appear totally nude,

_____

[10]Nor, apparently, does any other City ordinance do so.

10

apparently one may do so at the local Jiffy Mart or in the public library. As a result, the ordinance bans nudity with reference to the expressive content of that nudity, and is content-based. *See Schultz v. City of Cumberland*, 228 F.3d 831, 843 (7th Cir. 2000) (holding a similar ordinance content-based because "the Ordinance by its plain terms specifically targets erotic expression").[11]

Nor does 1204 appear to be a *Renton*-type of regulation of adult entertainment. Although it purports to be a mere regulation on the time, place, or manner of adult entertainment aimed at reducing its secondary effects, as permitted by *Renton*, it does not place restrictions on nude dancing in adult entertainment establishments. It bans it.[12]

Ordinance 1204 appears to be a discriminatory regulation that expressly targets and prohibits nude dancing. Neither *Barnes* nor *Erie* applied a secondary-effects rationale to permit a statute to *target* expressive conduct. In each, a content-neutral law of general application was upheld because it was justified without reference to nude dancing.

---

[11]Although Ordinance 1204 bans nudity of any type in an adult entertainment establishment, this includes the nude dancing that the ordinance by which the ordinance defines "adult entertainment." Section 2.5-5 (e).

[12]Nor do we think that the fact that one may apparently dance nude elsewhere in the City transform 1204 into a time, place, or manner regulation. 1204 effectively bans commercial nude dancing in the City. *See Schultz*, 228 F.3d at 846.

Nor does *Renton* permit a statute that targets nude dancing to completely *ban* it. 475 U.S. at 46 (The Renton ordinance, like the one in *American Mini Theaters*, does not ban adult theaters altogether, but merely provides that such theaters may not be located within 1,000 feet of any residential zone, single- or multiple-family dwelling, church, park, or school. The ordinance is therefore properly analyzed as a form of time, place and manner regulation"); *see also City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 443 (2002) ("ordinance warrants intermediate scrutiny only it if it is time, place, and manner regulation and not a ban").

Thus, Ordinance 1204 appears to be without constitutional underpinnings.[13] At least two courts have invalidated similar ordinances on the grounds that, by targeting and banning nude dancing, they unconstitutionally suppress protected speech. *Nakatomi Investments, Inc. v. City of Schenectady*, 949 F. Supp. 988, 998-999 (N.D. N.Y. 1997); *Books, Inc. v. Pottawattamie County, Iowa*, 978 F. Supp. 1247, 1257 (S.D. Iowa 1997); *see also Schultz*, 228 F.3d at 847-48 (invalidating

---

[13]The Supreme Court recently avoided deciding whether an ordinance that effectively bans a form of adult entertainment can be constitutional under some other theory. *Alameda*, 535 U.S. at 443 (Court of Appeals held that city's prohibition on combination of adult bookstores and arcades is not effectively a ban and respondents did not petition for review).

portion of city ordinance targeting adult entertainment that banned certain movements and gestures). Fly Fish argues that 1204 is similarly unconstitutional.

We disagree. Although not directly controlling,[14] we believe that the Court's analysis in *Erie* effectively forecloses this argument. In rejecting the dissent's claim that, as applied to nude dancing, the public nudity ordinance amounted to an unconstitutional complete ban on expression, the Court reiterated the distinction it made in *Barnes* between the means of expression – nudity – and the message – eroticism. 529 U.S. at 292-293. *See also* Barnes, 501 U.S. at 571 ("The appearance of people of all shapes, sizes and ages in the nude at a beach, for example, would convey little if any erotic message"). Rejecting the dissent's characterization of the ordinance as a complete ban on the message of nude dancing, the Court said:

> The public nudity ban certainly has the effect of limiting one
> particular means of expressing the kind of erotic message being
> disseminated at Kandyland. But simply to define what is being
> banned as the "message" is to assume the conclusion.

*Id.* at 293.

---

[14]*Erie*, of course, directly controls only cases involving general public nudity ordinances.

Although conceding that "there may be cases in which banning the means of expression so interferes with the message that it essentially bans the message," 529 U.S. at 293, the Court rejected the contention that *Erie* was such a case:

> [E]ven if Erie's public nudity ban has some minimal effect on the erotic message by muting that portion of the expression that occurs when the last stitch is dropped, the dancers at Kandyland and other such establishments are free to perform wearing pasties and G-strings. Any effect on the overall expression is *de minimis.*

*Id.* at 294.

If the message of nude dancing is eroticism, then Ordinance 1204 may properly be characterized as a *Renton*-type of time, place, or manner regulation. It does not ban erotic dancing, but rather totally nude dancing in an adult entertainment establishment. Therefore, it merely regulates the manner of presentation of the erotic message. It does not ban the message; it only requires more clothing on the messenger. Therefore, 1204 may be properly characterized as a time, place, and manner regulation.

This is so even though 1204's prohibition of nudity regulates conduct and is not a traditional zoning regulation of the type approved by *Renton*. *Erie* extends the secondary effects rationale of *Renton* beyond its zoning context to the

14

regulation of expressive conduct.[15]  Under *Renton*, an ordinance may target adult

entertainment establishments, and the nude dancing that occurs there, if it is aimed

at reducing the negative secondary effects associated with these establishments.[16]

After *Erie*, an ordinance may do so by banning totally nude dancing in these

establishments.  Thus, *Erie* makes clear that:

> Even if the city thought that nude dancing at clubs like Kandyland
> constituted a particularly problematic instance of public nudity, the
> regulation is still properly evaluated as a content-neutral restriction
> because the interest in combating the secondary effects associated
> with those clubs is unrelated to the suppression of the erotic message
> conveyed by nude dancing.

*Id.* at 296.

The City has determined that totally nude dancing in adult entertainment

establishments generates undesirable secondary effects.  Under *Erie* and *Renton*, it

---

[15]We anticipated this decision in *Sammy's of Mobile, Ltd. v. City of Mobile*, 140 F.3d 993, 999 (11th Cir. 1998).  In upholding an ordinance that banned nudity in establishments where alcohol is served, we analogized it to a zoning ordinance.  We said, "[j]ust as the cities in *Renton*, *Young*, and *International Eateries,* [Mobile] seeks, *geographically*, to separate adult entertainment establishments from other commercial establishments – in this case, bars – in order to minimize the secondary effects of that combination."  140 F.3d at 999 (emphasis added).

[16]Although Fly Fish does not claim on appeal that Cocoa failed to make a sufficient record regarding the secondary effects targeted by Ordinance 1204, the record is replete with evidence of this legislative purpose.  On the contrary, there is no evidence that the City seeks to suppress the erotic message of nude dancing, except the fact that its ordinance does, minimally, restrict this message.  *Erie* makes clear that this is not enough.  The connection between a proscription on total nudity in adult-entertainment establishments and suppression of erotic dancing is not a necessary one.  529 U.S. at 296.  It must be established by evidence, which is lacking in this case.

is entitled to combat these effects, so long as it does not ban, but merely regulates the erotic message. Ordinance 1204 is such an ordinance, and the district court did not err by not applying a heightened level of scrutiny.[17]

2) ***Ordinance 1204 As A Zoning Statute***

Ordinance 1204 also contains zoning provisions regulating the location of adult entertainment establishments. Under *Renton*, a zoning ordinance that restricts the location of adult entertainment establishments must serve a substantial government interest and "leave open ample alternative avenues of communication." 475 U.S. at 50. Fly Fish claims that Ordinance 1204 fails the second portion of this test because its zoning provisions provide only three sites for the four existing adult entertainment businesses, and set aside less than 1% of the City's acreage for such businesses. Ordinance 1204, § 2-2(a-c). Whether the sites available for adult businesses under a zoning ordinance provide reasonable avenues for communicating these businesses' erotic message is a question of law. *David Vincent, Inc. v. Broward County, Fla.*, 200 F. 3d 1325, 1335 (11th Cir. 2000).

---

[17]Fly Fish does not contend that the ordinance ban on nudity does not survive intermediate scrutiny, so we do not reach this issue.

Fly Fish argues for a "bright line test" for this issue. Under this test, a zoning ordinance that provides fewer that the existing number of sites for adult businesses would not, as a matter of law, leave open ample alternative channels for communication of their erotic message.

The Fifth Circuit has explicitly adopted such a test. *Lakeland Lounge of Jackson, Inc. v. City of Jackson, Miss.*, 973 F.2d 1255 (5th Cir. 1992); *Woodall v. City of El Paso*, 959 F.2d 1305 (5th Cir. 1992). Under this test, an ordinance is constitutional only if "[a]s a matter of arithmetic . . . there are more 'reasonable' sites available than businesses with demands for them." *Lakeland*, 973 F.2d at 1260.

Other circuits, while not viewing it as a bright line, have placed heavy emphasis on this "supply and demand" test. *Buzzetti v. City of New York*, 140 F3d 134, 141 (2d Cir. 1998) (ordinance unconstitutional unless it permits "all the City's existing adult establishments to continue to operate in the City, either at their current sites or at new locations"); *North Ave. Novelties, Inc. v. City of Chicago*, 88 F.3d 441, 445 (7th Cir. 1996) (there must be "no evidence that any person has attempted to open an adult use, but was prevented from doing so by [the] ordinance"); *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1532-33 (9th Cir. 1993) (invalidating adult business ordinance where the total

17

number of adult businesses that could coexist was fewer than the number of adult businesses already operating at the time the ordinance was enacted); *Alexander v. City of Minneapolis*, 928 F.2d 278, 284 n.5 (8th Cir. 1991) (ordinance must provide "ample opportunity for relocation"); *Walnut Properties, Inc. v. City of Whittier*, 861 F.2d 1102, 1104 (9th Cir. 1988) (striking down an ordinance that allowed only three of thirteen adult businesses to continue operating).[18]

The rationale of this test is obvious. By guaranteeing that the number of sites available under a new zoning ordinance is not less than the existing sites, the ordinance does not suppress speech, but merely relocates it, as allowed by *Renton*. 475 U.S. at 52 ("Cities may regulate adult theaters by dispersing them, . . . or by concentrating them, as in Renton"). Nothing in *Renton* indicates that an ordinance that purports to reduce the harmful secondary effects of protected conduct may do so by eliminating the protected conduct. *Id.* at 54 ("[W]e have cautioned against the enactment of zoning regulations that have 'the effect of suppressing, or greatly restricting access to, lawful speech'") (quoting *Young*, 427 U.S. at 71, n. 35)). On the contrary, *Renton* requires that an adult entertainment ordinance "refrain from

___

[18]The Ninth Circuit recently declined to adopt as a bright line the rule that a zoning ordinance is constitutional when the number of locations available for such businesses equals or exceeds the number of existing adult businesses. It declined to do so, however, because it thought that this rule might not sufficiently protect prospective adult businesses. *Young v. City of Simi Valley*, 216 F.3d 807, 822-823 (9th Cir. 2000) (rule insufficient to account for the chilling effect that an adult use zoning ordinance may have on prospective business owners).

effectively denying [adult businesses] a reasonable opportunity to open and operate an adult theater within the city." *Id.* at 54.

Recently, Justice Kennedy highlighted this aspect of *Renton*. In his concurrence in *Alameda*,[19] he cautioned us to remember that "a city may not regulate the secondary effects of speech by suppressing the speech itself." 535 U.S. at 445.[20] The purpose and effect of a zoning ordinance must be to reduce secondary effects and not to reduce speech. *Id. See also Lakeland*, 973 F.2d at 1260 ("this ordinance does not reduce the number of establishments that can open in Jackson, so it does not limit expression") (citing *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 71 (1981) (ordinance banning nude dancing in *American Mini Theaters* distinguished, because it "did not affect the number of adult movie theaters that could operate in the city")).

Although we have repeatedly said that whether a zoning ordinance leaves open ample alternatives for communication must be resolved on a "case-by-case basis," *David Vincent*, 200 F.3d at 1336; *Boss Capital, Inc. v. City of Casselberry*,

---

[19]Justice Kennedy's concurrence represented the fifth vote for the plurality opinion, and thus forms the narrowest ground upon which it rests. *Marks v. United States*, 430 U.S. 188 (1977).

[20]The plurality agreed with this "unobjectionable proposition," stating that it viewed it as a "reformulation of the requirement that an ordinance warrants intermediate scrutiny only it if it is time, place, and manner regulation and not a ban." 535 U.S. at 443.

187 F.3d 1251, 1254 (11th Cir. 1999),[21] we have also consistently recognized the importance of "the correlation of available sites to existing adult businesses." *David Vincent, id.*; *see also International Eateries of America, Inc. v. Broward County*, 941 F.2d 1157, 1165 (11th Cir. 1991) (twenty-six sites available for one existing adult entertainment business). We have cited with approval opinions of the Ninth and Fifth Circuits holding that adult businesses must be given a "reasonable opportunity to relocate" and that "the number of sites available for adult businesses under the new zoning regime must be greater than or equal to the number of adult businesses in existence at the time the new zoning regime takes effect." *David Vincent*, 200 F.3d at 1337 n.17 (citing *Topanga*, 989 F.2d at 1532-33 and *Woodall*, 49 F.3d at 1126). In no case have we upheld a zoning ordinance that provides fewer locations than there are presently operating adult establishments.

At least two district courts in this circuit have applied the supply and demand test to invalidate zoning ordinances providing fewer than formerly

---

[21]Factors to be considered include the community's population and size, the acreage available to adult businesses as a percentage of the overall size, the location of available sites, *the number of adult businesses already in existence*, and the number of adult businesses wanting to operate in the community in the future." *Boss Capital*, 187 F.3d at 1254. On remand in *Boss Capital*, the district court upheld the zoning ordinance in part because it provided five sites for three existing adult businesses and one new applicant. 2002 WL 31475217 (M.D. Fla. January 31, 2002).

available sites for adult entertainment. *University Books and Videos, Inc. v. Miami-Dade County*, 132 F. Supp. 2d 1008 (S.D. Fla. 2001); *Purple Onion, Inc. v. Jackson*, 511 F. Supp. 1207 (N.D. Ga. 1981). In *Purple Onion*, the Georgia court invalidated Atlanta's adult entertainment zoning ordinance because it "squeezed" out of business two-thirds of the existing establishments. 511 F. Supp. at 1224. Although recognizing that "Georgia law permits municipalities to terminate, over time, pre-existing nonconforming uses," the district court held that "such ordinances should be carefully scrutinized where First Amendment interests are affected." *Id.* Similarly, in *University Books*, the district court rejected a zoning ordinance that provided no more than a dozen locations for thirty-nine existing adult entertainment establishments. 132 F. Supp. at 1015.

A third district court in this circuit invalidated a zoning ordinance that curtailed all future access to the adult entertainment business. *Bayside Enterprises, Inc. v. Carson*, 450 F. Supp. 696 (M.D. Fla. 1978). The court characterized the zoning plan as "for all practical purposes, a total ban on the establishment of new adult bookstores or movie houses." *Id.* at 702. Consequently, according to the court, "the suppressive effects of the zoning scheme are readily apparent since, aside from those who presently do so, no one

21

will be allowed a forum through which to disseminate sexually explicit . . . forms of expression." *Id.* at 703.[22]

Though we do not today adopt a bright line rule that a zoning ordinance that does not provide sufficient sites for the relocation of all existing adult entertainment establishments is unconstitutional, we conclude that this factor is dispositive in this case. Three adult entertainment establishments have operated in Cocoa for over twenty years. Sassy's has operated for over six years. When it opened in 1997, it offered nude dancing, but, since its dancers covered the anatomical parts specified by Cocoa's prior adult entertainment ordinance as defining nude dancing, the ordinance did not apply to it and the club was a conforming use. In 1999, the City amended its Adult Entertainment Ordinance to broaden the definition of adult business to include dancing for tips. This amendment effectively made Sassy's an adult business for licensing and zoning purposes.

Additionally, prior to 1999, all of Cocoa's existing adult businesses were nonconforming uses. They were non-conforming because none of them could

---

[22] Recently, we recognized without deciding that a zoning ordinance that would require the closure of a previously conforming adult business might raise First Amendment issues about a statute that otherwise survives time, place, and manner scrutiny. *Ranch House, Inc. v. Amerson*, 238 F.3d 1273, 1287 (11th Cir. 2001).

meet the City's separation requirements from "sensitive uses." Following the enactment of Ordinance 1204, the City eliminated the protection of nonconforming use status and instead required all nonconforming businesses to close after September 2002.

The City also abandoned its use of the conventional zoning provisions separating adult businesses from other commercial venues, and instead specified three lots by their metes and bounds legal description as the only lawful sites for adult entertainment establishments. These three sites were (and are) completely occupied by the other three adult entertainment establishments in Cocoa. As a result of these events, the City's 1999 zoning ordinance provided only three sites for four lawfully existing adult entertainment establishments.

Instead of leaving open ample alternative means of communication for Sassy's erotic message, the actions taken by Cocoa have effectively zoned Sassy's out of existence.[23] Furthermore, if enforced, the new ordinance would reduce the

---

[23]The City concedes that the "deception" of Fly Fish in not informing it that Sassy's would offer nearly nude dancing "ultimately contributed to the City passing the amended adult entertainment ordinance at issue, in 1999"). Red Brief at 14. Although it is clear that Fly Fish did not inform the City of its intent, it is equally clear that the nearly nude dancing it offered did not constitute "adult entertainment" as defined by the City's then applicable zoning ordinance. We are mindful of Justice Powell's caution in *Young v. American Mini Theaters, Inc.*, 427 U.S. 50, 84 (1976), that "courts must be alert to the possibility of direct rather than incidental effect of zoning on expression, and especially to the possibility of using the power to zone as a pretext to suppressing expression."

number of adult entertainment establishments by 25% in a town that has supported four establishments for many years. Neither of these results meets the *Renton* test. *See D.H.L. Associates, Inc. V. O'Gorman*, 199 F.3d 50, 60 (1ˢᵗ Cir. 1999) (establishment that "lawfully offered adult entertainment in [the city] since before the enactment of the 1987 zoning ordinance . . . has a right to continue operating despite the fact that it is not located in the [designated] zone"); *Ebel v. City of Corona*, 767 F. 2d 635, 639 (zoning ordinance that did not provide alternate site for existing business unconstitutional).

Nor does our review of any of the other relevant factors, including the less than 1% of the city's total acreage remaining available to adult businesses, militate in favor of a holding that the ordinance leaves open ample alternative avenues of communication for the regulated, but protected, message. Accordingly, we hold the zoning provision of Ordinance 1204 unconstitutional.

3) ***Ordinance 1204's Licensing Provisions***

The district court held the licensing provisions of Ordinance 1204 unconstitutional because they vest unfettered discretion in the City to deny a license and impose no time restriction on this decision. The district court upheld the ordinance's licensing fee. The parties filed cross-appeals on these issues.

    1.    <u>The Licensing Process</u>

Ordinance 1204 provides that the City may deny an applicant a license if "the granting of the application would violate either a statue or ordinance or an order from a Court of law that effectively prohibits the applicant from obtaining an adult entertainment establishment license," or if the applicant fails to comply with Florida law regarding corporations, partnerships, or fictitious names. Ordinance 1204, §§ 2.5-12(c)(1)(E) & (F). Furthermore, the ordinance does not require the City to act on an application within a prescribed time period, providing only that, if the City fails to act within thirty days, a license to operate pending that decision must be issued. Ordinance 1204, § 2.5-12(a).

The district court held that these provisions amounted to an unconstitutional prior restraint upon protected expression.[24] We agree.

"[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v. County of Birmingham*, 394 U.S. 147, 150-51 (1969). *See also Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988). We have previously invalidated such statutes, holding:

---

[24]We note that there is no showing in the record that §§ 2.5-12(c)(1)(E) & (F) were applied to deny Fly Fish an adult entertainment license. Therefore, the challenge to the ordinance must be on its face. Although facial challenges to legislation are disfavored, they are permitted where the claim is that a licensing scheme vests unbridled discretion in the decision maker or that the regulation is overbroad. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990) (citing *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 798, and n. 15 (1984)).

25

[S]tatutes may not give public officials "unbridled" discretion to deny permission to engage in constitutionally protected expression. This implies that some measure of discretion is acceptable, but . . . virtually any amount of discretion beyond the merely ministerial is suspect.

*Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1362 (11th Cir. 1999) (citations omitted).

Ordinance 1204 exceeds the limits of permissible "ministerial discretion." Its provisions permit city officials to decide which statutes or ordinances apply, whether the applicant has violated those laws, and whether they "effectively" prohibit the applicant from obtaining a license. In striking down a similar licensing scheme, we held:

[T]he decision of which ordinances apply, and whether such ordinances have been violated in any given case are decisions that [the ordinance] leaves to the judgment of the city clerk and city commission. City officials thus retain considerable discretion to find ordinance violations, and consequently to deny licenses.

*Miami Herald Pub. Co. v. City of Hallandale*, 734 F.2d 666, 675 (11th Cir. 1984). As in *Hallandale*, the judgments authorized by the provisions of Ordinance 1204 cannot be reasonably characterized as simply ministerial.

The ordinance also permits the City unconstitutionally to deny an adult entertainment license by failing to act on an application. *See Freedman v. Maryland*, 380 U.S. 51, 59 (1965) (Constitution requires limitation on the time

26

within which licensing decision is made); *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990) (licensing officials required to make prompt decisions);[25] *Artistic Entertainment, Inc. v. City of Warner Robbins*, 233 F.3d 1306, 1310-1311 (11th Cir. 2000). Although the ordinance requires a decision on a adult entertainment license application within thirty days, it also permits the establishment whose application is not so resolved to open, conditioned on the ultimate licensing decision of the City. Effectively, this gives the City an unlimited length of time to make the application decision. We have previously held such a conditional right to be an unconstitutional prior restraint. *Lady J. Lingerie*, 176 F.3d at 1363. We said there:

> Does it matter that an applicant may begin operating while the [zoning] board is still considering its application? We think not. The ordinance only permits applicants to operate conditionally. Once the board denies an application for an exception, the applicant must close its doors. A conditional exception is no exception at all.

*Id.*

---

[25]We do not agree with the City that *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 322 (2002), in any way altered the *Freedman* and *FW/PBS* requirements for content-based licensing provisions targeting adult entertainment establishments. *See Thomas*, 534 U.S. at 322 n.2 (distinguishing licensing schemes that target sexually explicit speech from its public forum analysis of a content-neutral regulation); *Encore Videos, Inc. v. City of San Antonio*, F.3d , 2003 WL 1964188 (5th Cir. April 29, 2003) (relevance of *FW/PBS* to licensing schemes for adult entertainment establishments unaffected by Thomas' public forum analysis).

27

In so far as Ordinance 1204 permits city officials excessive discretion in making the licensing decision and an indefinite period of time within which to make that decision, we hold that these provisions are unconstitutional.[26]

2.    The Licensing Fee

Finally, Fly Fish contends that the City may not charge a licensing fee that constitutes a tax on the exercise of First Amendment protected expressive conduct. *See Murdock v. Pennsylvania*, 319 U.S. 105, 113-14 (1943)*; Cox v. New Hampshire*, 312 U.S. 569, 577 (1941)*.*  Under *Murdock* and *Cox*, when core First Amendment freedoms are made subject to a licensing scheme, only revenue-neutral fees may be imposed so that government is not charging for the privilege of exercising a constitutional right.  *Id.  See also Sentinel Communications v. Watts*, 936 F.2d 1189, 1205 (11th Cir. 1991) (government may not profit from imposing revenue-raising fees on exercise of First Amendment rights). Furthermore, it is the government's burden to demonstrate that its licensing fee is reasonably related to recoupment of the costs of administering the licensing program.  *Id.*

---

[26]Fly Fish does not contest the district court's holding that these provisions are severable from the remainder of the ordinance's licensing provisions.

28

The City contends that these cases do not apply to the fee at issue here, because adult entertainment – nude dancing – is not a "core" First Amendment freedom and does not enjoy more than "marginal" constitutional protection. The Eighth Circuit has endorsed this view. *Jakes, Lt'd., Inc., v. City of Coates*, 284 F.3d 884, 890-891 (8th Cir. 2002) (*Murdock* and *Cox* restrictions on licensing fee do not apply to nude dancing).

The district court did not discuss this issue, upholding the fee without comment. We cannot do the same.

Although we have not previously done so, at least one other circuit court and many district courts, including one in this circuit, have held that *Cox* and *Murdock* do apply to licensing fees on adult entertainment. *Deja Vu of Nashville, Inc. v. Nashville*, 274 F.3d 377, 395 (6th Cir. 2001); *Kentucky Restaurant Concepts, Inc. v. City of Louisville, Jefferson County, Ky.*, 209 F. Supp. 2d 672, 691-692 (W.D. Ky. 2002); *AAK, Inc. v. City of Woonsocket*, 830 F. Supp. 99, 105 (D.R.I. 1993); *Ellwest Stereo Theater, Inc. v. Boner*, 718 F. Supp. 1553, 1574 (M.D. Tenn. 1989); *Bayside Enterprises, Inc. v. Carson*, 450 F. Supp. 696, 704-705 (M.D. Fla. 1978).

We agree. Although nude dancing may be at the "outer perimeter" of the First Amendment's protection, the Supreme Court has never suggested that it is

29

not protected by the First Amendment. On the contrary, *Erie* recently specifically reaffirmed that it is so protected. 529 U.S. at 289. The Court made clear that a law aimed at suppressing this protected conduct would violate the First Amendment. *Id.*

Thus, we find no support in *Erie* for the Eighth Circuit's conclusion that nude dancing is "'only marginally' protected." *Jakes*, 284 F.3d at 891. In fact, the presence of quotation marks around this phrase in *Jakes* indicates that the court thought it was quoting *Barnes*. What the Supreme Court actually said in *Barnes* was that "nude dancing of the kind sought to be performed here is expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so." Whether at the core or at the margin, a central tenet of *Barnes* is that, as expressive conduct protected by the First Amendment, government may not ban nude dancing.[27] If government may not ban nude dancing, we fail to see how it may tax that activity without constitutional limit. *See Murdock*, 319 U.S. at 113-14; *Cox*, 312 U.S. at 577.

---

[27]It may, however, be restricted as an incident of a lawful ban on public nudity. 501 U.S. at 571.

Accordingly, we hold today that a licensing fee on adult entertainment establishments is controlled by *Cox* and *Murdock* and must be reasonably related to recouping the costs of administering the licensing program.

Having so decided, it is the City's burden to establish that its licensing fee is justified by the cost of processing the application. *Id. See also Bayside Enterprises*, 450 F. Supp. at 704-705. The record made by the City in this case is wholly inadequate to make such a showing. The City concedes that it has conducted no real accounting of the costs of administering its licensing program. Instead, the City argues that the $5000 ($1250 x 4 adult businesses) it collects to administer and enforce its licensing program is reasonable as a matter of law. We disagree. In fact, this seems a substantial amount to administer a program that routinely reapproves the three twenty-year old businesses that the ordinance allows. Absent a record sufficient to support the City's claim that its licensing fee is constitutionally reasonable, we hold that the present fee is unconstitutional.

## III.

For the foregoing reasons, we hold that Ordinance 1204's prohibition on nudity in adult entertainment establishments is a constitutional exercise of the City's police power to combat the secondary effects of nude dancing. Section 2-2 (a-c), which permit adult entertainment establishments only at three specified

locations, unconstitutionally fails to provide ample alternative means of communication for the four existing such businesses. Sections 2.5-12(a) (c)(1)(E) & (F) vest unbridled discretion over the licensing process in city officials and are, for that reason, unconstitutional. The licensing fee imposed by Section 2.5-14 is unconstitutional because it must be reasonably related to the costs of administering the licensing program and the City failed to establish this fact.

The judgment of the district court is AFFIRMED IN PART and REVERSED IN PART. The case is remanded to the district court for further proceedings in accordance with this opinion.