[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**
**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**June 9, 2005**
**THOMAS  K. KAHN**
**CLERK**

_____

No. 03-15685

_____

D. C. Docket No. 01-01416-CV-BBM-1

ZIBTLUDA, LLC,
a Georgia corporation,

Plaintiff-Appellant,

versus

GWINNETT COUNTY, GEORGIA,
by and through the Board of
Commissioners of Gwinnett County,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(June 9, 2005)**

Before EDMONDSON, Chief Judge, MARCUS and PRYOR, Circuit Judges.

PRYOR, Circuit Judge:

This appeal presents two issues: (1) whether an ordinance in Gwinnett

County, Georgia, provides an applicant who has been denied a license to operate an adult entertainment business a prompt judicial decision, as the First and Fourteenth Amendments require; and (2) whether the district court properly determined that the ordinance was adopted to combat the secondary effects of adult entertainment businesses, which required the court to apply intermediate scrutiny. Because Georgia law provides adequate assurance that an aggrieved applicant can obtain a prompt judicial decision and the record shows that the County adopted the ordinance to combat the secondary effects of adult entertainment businesses, we conclude that this facial challenge to the ordinance fails. We affirm the district court.

## I.  BACKGROUND

Zibtluda, whose counsel explained at oral argument that the name of his client is "adult biz" spelled backwards, operates adult entertainment businesses in metropolitan Atlanta under the name "The Love Shack." Zibtluda developed a business plan to sell in several locations in Gwinnett County books, magazines, and movies that depict sexual content. The special occupational tax and zoning ordinance for adult entertainment businesses adopted in 1998 by Gwinnett County presented obstacles to that plan, however.

In June 2001, Zibtluda sued Gwinnett County in the Northern District of

2

Georgia and moved for an injunction to prevent the continued enforcement of the 1998 ordinance, which governed the issuance of licenses for which Zibtluda had applied. The district court concluded that Zibtluda established a likelihood of success on the merits of its arguments that the 1998 ordinance was vague, overbroad, and an unconstitutional prior restraint. On Friday, July 13, 2001, the court entered a preliminary injunction against the County.

On Monday, July 16, 2001, Zibtluda representative John Cornetta applied for and obtained a new occupational tax certificate for an existing Love Shack location. The next day, July 17, 2001, John Fry, another representative of Zibtluda, tried to obtain four occupational tax certificates, two for existing businesses and two for new Love Shack locations. County officials asked Fry to present verification that the businesses for which he sought the certificates were in the appropriate zoning sections, under the 1985 Zoning Resolution of Gwinnett County, which restricts adult entertainment businesses to zoning districts C-2 (General Business) and C-3 (Highway Business). When he went to the zoning department, Fry was told that he needed to submit an application in writing to obtain the verification.

Later that day, the County adopted a new ordinance to replace the enjoined 1998 ordinance. When the four new occupational tax applications of Zibtluda

3

arrived by mail, they did not meet the requirements of the July Ordinance, which now governed those applications. Because the enactment of the July Ordinance, at least arguably, did not conform with state-law procedural requirements, the County adopted a substantially similar ordinance on August 7, 2001. Each ordinance amended two portions of the Gwinnett County statutes, but the parties agreed, in the district court, that those ordinances could be evaluated as a single legislative act. We refer to the ordinances passed in July and August 2001 collectively as the 2001 Ordinance.

The 2001 Ordinance regulates comprehensively the operation of adult entertainment businesses in Gwinnett County. Establishments governed by the 2001 Ordinance include those where persons perform either fully or partially nude; where more than ten feet of floor space or five percent of net sales are derived from the sale of adult magazines, books, or movies; and adult movie theaters, mini-theaters, video stores, arcades, hotels, and motels. 2001 Ordinance § 86-71. The 2001 Ordinance, in other words, regulates commercial entertainment akin to the "Huggin' and a kissin', dancin' and a lovin', wearin' next to nothing" that the B-52s famously described as occurring in a "funky old shack." The B-52s, Love Shack, on Cosmic Thing (Reprise Records 1989).

Section 86-70 states the several findings of the board of commissioners of

4

the County that "'adult entertainment' . . . begets criminal behavior and tends to create undesirable community conditions." 2001 Ordinance § 86-70. That section refers to "the experiences of other counties and municipalities, including, but not limited to, Austin, Texas and Garden Grove, California." Id. Section 86-70 also states that the 2001 Ordinance is "based on the documentary evidence and oral testimony presented by a law enforcement professional and an expert in economic development, both of whom are familiar with conditions resulting in other localities, at the board of commissioners' hearing on July 17, 2001." Id.

The 2001 Ordinance provides that the County licensing and revenue manager "shall" grant a license to any applicant who satisfies nine objective criteria: (1) payment of the application fee; (2) no material misrepresentations in the application; (3) the applicant, owners, and operators of the proposed business have not been convicted of certain sexual-related crimes within five years of the application date; (4) the applicant has not had an adult entertainment business license revoked in the past five years, (5) the facility for the business conforms with all public health, zoning, and safety laws; (6) the applicant is at least 18 years old; (7) the proposed business will have at least one operator on site during business hours; (8) the facility meets the requirements for minimum distance from residences, churches, schools, public parks, and businesses with liquor licenses;

5

and (9) the grant of the license will not run afoul of any law. Id. § 86-74. If the licensing and revenue manager fails either to approve or deny the application within 30 days, then "the license application shall be deemed approved, and expressive conduct may begin immediately notwithstanding the fact that no license has been issued." Id. § 86-80(b).

The 2001 Ordinance also contemplates the availability of judicial review for a denial of a license. The 2001 Ordinance states that an unsuccessful applicant can seek review by mandamus, certiorari, or appeal in a superior court in Georgia:

> Any person aggrieved by any decision of the county, its officials, employees or agents pursuant to this article, may seek review of such decision by filing an appropriate pleading in the superior court of the county or any other court of competent jurisdiction including, but not limited to, a mandamus petition pursuant to O.C.G.A. §§ 9-6-20 [to] 9-6-28. Any person aggrieved by any decision of the county, its officials, employees, or agents pursuant to this article may also seek review of such decision by filing a petition for writ of certiorari or an appeal to the superior court pursuant to the provisions of Section 1609 of the 1985 Zoning Resolution of Gwinnett County.

Id.

On August 19, 2002, Zibtluda amended its complaint against Gwinnett County to challenge the 2001 Ordinance enacted a year earlier. The County answered the amended complaint and moved for summary judgment. The district court granted summary judgment for the County. The district court relied on our decision in Boss Capital, Inc. v. City of Casselberry, 187 F.3d 1251, 1256-57 (11th

6

Cir. 1999), and concluded that the 2001 Ordinance was not a prior restraint on expression because it guaranteed "prompt access to judicial review," which was "sufficient for adult entertainment licensing ordinances" to satisfy the requirements set forth by the Supreme Court. This appeal followed.

## II. STANDARD OF REVIEW

We review a summary judgment de novo. Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1357 (11th Cir. 1999). Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). In examining the record, we view the evidence in the light most favorable to the non-moving party. Damon, 196 F.3d at 1358.

## III. DISCUSSION

Zibtluda makes two arguments. Zibtluda first contends that the district court erred because Georgia law does not assure a prompt judicial decision for an applicant who seeks judicial review of a denial of a license to operate an adult entertainment business. Zibtluda argues alternatively that the district court erred when it did not subject the 2001 Ordinance to strict scrutiny because the adoption of that ordinance was content-based. We address each argument in turn.

7

*A. The Challenged Ordinance Provides the Prompt Judicial Decision Required by Littleton.*

We begin by acknowledging that, in City of Littleton v. Z.J. Gifts D-4, L.L.C., 541 U.S. 774, 124 S. Ct. 2219 (2004), the Supreme Court resolved a split among the circuits regarding the evaluation of the first issue presented in this appeal, and based on Littleton, our decision in Boss Capital is no longer good law. Although the district court relied on Boss Capital, we still may affirm on any ground supported by the record. Higdon v. Jackson, 393 F.3d 1211, 1218 (11th Cir. 2004). We must evaluate this appeal based on the standard elucidated by the Supreme Court last year in Littleton.

In Littleton, the Supreme Court concluded that the First Amendment is satisfied when an applicant is denied a license to operate an adult entertainment business, under an ordinance with objective criteria, so long as ordinary rules of court afford the aggrieved applicant a prompt judicial decision:

> . . . the First Amendment . . . does not require [local governments] to impose 2- or 3-day time limits [on the commencement of judicial review when adult entertainment businesses are concerned]; the First Amendment does not require special "adult business" judicial review rules; and the First Amendment does not insist that [local governments] write detailed judicial review rules into the ordinance itself. In sum, . . . ordinary "judicial review" rules offer adequate assurance, not only that access to the courts can be promptly obtained, but also that a judicial decision will be promptly forthcoming.

Littleton, 541 U.S. at ___, 124 S. Ct. at 2224. In contrast, Boss Capital concluded

8

that the First Amendment required only access to prompt judicial review, not a prompt decision. Our task then is to determine whether the ordinary rules of judicial review in Georgia ensure that an applicant who files suit after he has been denied a license to operate an adult entertainment business in Gwinnett County will receive a prompt judicial decision.

Gwinnett County argues that, as in Littleton, four factors "taken together" ensure that a prompt judicial decision can be obtained to prevent prior restraints on protected expression in the judicial review of a denial of a license under the 2001 Ordinance. See Littleton, 541 U.S. at ___, 124 S. Ct. at 2226. We agree. As Judge O'Scannlain explained for the Ninth Circuit, the Supreme Court, in Littleton, effectively "established a presumption that state courts function quickly enough, and with enough solicitude for the First Amendment rights of license applicants, to avoid the unconstitutional suppression of speech that arises from undue delay in judicial review" when an ordinance is challenged facially. Dream Palace v. County of Maricopa, 384 F.3d 990, 1003 & n.8 (9th Cir. 2004). As we review each of the four factors identified by the Supreme Court in Littleton, we are persuaded that the ordinary rules of court in Georgia, like those in Colorado, assure a prompt decision for an applicant who seeks judicial review of a denial of a license.

The first factor is that "ordinary court procedural rules and practices ...

9

provide reviewing courts with judicial tools sufficient to avoid delay-related First Amendment harm." Littleton, 541 U.S. at ___, 124 S. Ct. at 2224-25. In Littleton, the Supreme Court concluded that Colorado provided one of these judicial tools through the availability of accelerated proceedings in Colorado trial courts, under Colorado Rule of Civil Procedure 106(a)(4)(VIII). Id. at ___, 124 S. Ct. at 2225. The Court also determined that "higher courts may quickly review adverse lower court decisions" in Colorado and cited a decision of the Supreme Court of Colorado that granted expedited review, under Colorado Appellate Rule 50. Id., 124 S. Ct. at 2225 (citing Goebel v. Colorado Dep't of Insts., 764 P.2d 785, 792 (Colo. 1988)).

Georgia law likewise provides "judicial tools sufficient to avoid delay-related First Amendment harm." Littleton, 541 U.S. at ___, 124 S. Ct. at 2224-25. The 2001 Ordinance states that "[a]ny person aggrieved by any decision ... pursuant to this article[] may seek review of such decision by filing an appropriate pleading in the superior court of the county or any other court of competent jurisdiction . . . ." 2001 Ordinance § 86-80. The superior courts are the trial courts of general jurisdiction in Georgia. Ga. Const. Art. 6, § 4, ¶ I; O.C.G.A. § 15-6-8(1) & (6). The 2001 Ordinance also states that an applicant denied a license can seek review, under state law, by writ of mandamus, writ of certiorari, or

10

appeal. 2001 Ordinance § 86-80.

At oral argument, counsel for Zibtluda complained that the process for obtaining a writ of certiorari was a trap for the unwary with no assurance of a prompt decision, but he failed to explain why the other remedies enumerated in the 2001 Ordinance would not provide a prompt decision for an aggrieved applicant for a license. As we read the 2001 Ordinance, it does not create or limit the processes for judicial review, because that is the province of the Georgia Legislature, not Gwinnett County. In the absence of evidence or credible argument that the judicial remedies enumerated in section 86-80 are illusory, we presume that at least one of those remedies would enable an aggrieved applicant to obtain a prompt judicial decision. See Dream Palace, 384 F.3d at 1003 n.8.

Georgia also provides for expedited decisions when appropriate. At the trial level, both expedited discovery and rulings are available in the superior court. See O.C.G.A. §§ 9-11-30(a), 9-11-34(b)(2); Ga. Unif. Super. Ct. R. 6.7. The Georgia courts also routinely grant expedited appeals. See, e.g., Perdue v. Palmour, 600 S.E.2d 370, 371 (Ga. 2004); Miller v. Med. Ass'n of Ga., 423 S.E.2d 664, 665 (Ga. 1992); Napper v. Ga. Television Co., 356 S.E.2d 640, 642 (Ga. 1987). These tools evidence an assurance that the judiciary of Georgia would provide a prompt decision for an aggrieved applicant for a license, under the 2001 Ordinance.

11

The second factor involves "the willingness of [state] judges to exercise powers wisely so as to avoid serious threats of delay-induced First Amendment harm." Littleton, 541 U.S. at __, 124 S. Ct. at 2225. The Supreme Court explained in Littleton that there was "no evidence before [it] of any special Colorado court-related problem," and the Court "presume[d] that [the Colorado] courts are aware of the constitutional need to avoid 'undue delay' . . . ." Id. at __, 124 S. Ct. at 2225. The Court added, "And were there some such problems, federal remedies would provide an additional safety valve." Id. (citing 42 U.S.C. § 1983).

We likewise have no reason to doubt that Georgia judges would exercise their authority to avoid serious threats of harm to First Amendment rights. As in Littleton, there is no evidence in this record of any special problem of undue delay in the courts of Georgia, and we presume that those courts would respect the precedents of the Supreme Court. At oral argument, counsel for Zibtluda also conceded that federal remedies, including 42 U.S.C. section 1983, would be available as a safety valve. See also Flournoy v. Akridge, 400 S.E.2d 649 (Ga. App. 1990); Forney v. Purvis, 378 S.E.2d 470 (Ga. App. 1989).

The third factor is that "the ordinance at issue . . . does not seek to censor material. And its licensing scheme applies reasonably objective, nondiscriminatory criteria unrelated to the content of the expressive materials that

12

an adult business may sell or display." Littleton, 541 U.S. at ___, 124 S. Ct. at 2225. The objective criteria of the licensing scheme, in Littleton, were "simple enough to apply and their application simple enough to review that their use [wa]s unlikely in practice to suppress totally the presence of any specific item of adult material in the Littleton community." Id., 124 S. Ct. at 2225. "And the simple objective nature of the licensing criteria means that in the ordinary case, judicial review, too, should prove simple, hence expeditious." Id., 124 S. Ct. at 2226.

The 2001 Ordinance, like the licensing ordinance in Littleton, has objective criteria and a 30-day deadline that restrict the ability of County officials to deny licenses for adult entertainment businesses. The criteria of the 2001 Ordinance are strikingly similar to those that the Court approved in Littleton. Compare 2001 Ordinance § 86-74(d), with 541 U.S. at ___, 124 S. Ct. at 2225. Those objective criteria also are both simple for the County official to apply and simple for a court to review in an expeditious judicial proceeding. Littleton, 541 U.S. at ___, 124 S. Ct. at 2225-26.

The fourth and final factor is that it is sufficient for state, not local, law to provide the rules for judicial review. "[N]othing in [the earlier precedents of the Court] requires a city or a State to place judicial review safeguards all in the city ordinance that sets forth a licensing scheme." Id. at ___, 124 S. Ct. at 2226. The

13

Court was unsurprised that "cities and towns lack the state-law legal authority to impose deadlines on state courts." Id., 124 S. Ct. at 2226.

At oral argument, both parties represented to this Court that the rules for judicial review of a decision under the 2001 Ordinance are provided by state law, not a local ordinance, as was true in Littleton. Although the 2001 Ordinance lists three possible methods of judicial review, the 2001 Ordinance cannot bind the state courts, and the County cannot set deadlines for the independent judiciary of Georgia. As in Littleton, that circumstance is unsurprising.

These fours factors, taken together, provide adequate assurance of a prompt judicial decision. That assurance means that the facial challenge of Zibtluda on this ground fails. We now turn to the alternative argument of Zibtluda.

*B. The District Court Correctly Applied Intermediate Scrutiny to the 2001 Ordinance.*

Zibtluda contends that the district court erred when it applied intermediate scrutiny, under the "secondary effects" doctrine, rather than strict scrutiny, to the 2001 Ordinance. See generally Ranch House, Inc. v. Amerson, 238 F.3d 1273 (11th Cir. 2001). Zibtluda contends that the 2001 Ordinance was enacted to suppress protected speech and is subject to strict scrutiny. Gwinnett County responds that the 2001 Ordinance was adopted to combat the secondary effects of adult entertainment businesses and is properly reviewed under intermediate

14

scrutiny. After careful review of the record, we agree with the County.

The Supreme Court has made clear that when the purpose of an adult entertainment ordinance is to ameliorate the secondary effects of adult businesses, intermediate scrutiny applies. In City of Renton v. Playtime Theaters, Inc., the Supreme Court upheld a zoning ordinance that prohibited adult movie theaters from locating within 1000 feet of a residential area, a school, a church, or a park. 475 U.S. 41, 106 S. Ct. 925 (1986). The Court stated that "zoning ordinances designed to combat the undesirable secondary effects of such businesses are to be reviewed under the standards applicable to 'content-neutral' time, place, and manner regulations." Id. at 49, 106 S. Ct. at 929-30. (citing Young v. Am. Mini Theatres, 427 U.S. 50, 96 S. Ct. 2440 (1976)). Accordingly, the Court found the proper inquiry to be whether "the ordinance is designed to serve a substantial governmental purpose and allows for reasonable alternative avenues of communication." Renton, 475 U.S. at 50, 106 S. Ct. at 930.

We have explained that, although these ordinances are not strictly content-neutral, they are simply treated as such. Fly Fish, Inc. v. City of Cocoa Beach, 337 F.3d 1301, 1306 (11th Cir. 2003). "These regulations define the regulated conduct by its expressive content, and, to this extent, they are 'content-based.' Their purpose, however, is not to ban the expressive conduct, but merely to establish

15

restrictions on the time, place and manner of its presentation. Although content-based, such a regulation will be treated as if it were content-neutral if it serves a substantial government purpose that is unrelated to the suppression of the expressive conduct." Id. (citations omitted). This acknowledgment derives from Justice Kennedy's controlling concurrence in City of Los Angeles v. Alameda Books, Inc., in which he insisted that the characterization of secondary-effects ordinances as content neutral in Renton was a "fiction." 535 U.S. 425, 448, 122 S. Ct. 1728, 1741 (2002) (Kennedy, J., concurring).

The Supreme Court in Renton conducted its analysis in three steps. First, it noted that the ordinance did not ban adult theaters altogether, and thus was properly analyzed as a time, place, and manner regulation. Id. at 46, 106 S. Ct. at 928. Second, it considered whether the regulation was content-based (in which case it was subject to strict scrutiny and presumptively unconstitutional) or content-neutral (in which case it was subject to intermediate scrutiny and thus permissible so long as it was "designed to serve a substantial governmental interest and [did] not unreasonably limit alternative avenues of communication"). Id. at 47, 106 S. Ct. at 928. Finding the ordinance to be content-neutral, the Court then went on to the third step, analyzing whether the ordinance served a substantial governmental interest and left open sufficient alternative channels of

16

communication.  Id. at 49, 106 S. Ct. at 930; see also Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 337 F.3d 1251, 1264 (2003).

The only issue for us to address here is the second step of the Renton inquiry – whether the 2001 Ordinance is properly treated as content-neutral, in that its purpose is to combat the negative secondary effects of adult businesses, and subject to intermediate scrutiny.  If so, the 2001 Ordinance can be deemed to satisfy the whole Renton inquiry, because Zibtluda argues only that intermediate scrutiny is the wrong standard, not that the 2001 Ordinance cannot survive intermediate scrutiny.  Zibtluda does not argue that the 2001 Ordinance fails to leave open adequate alternative channels of communication (that is, a sufficient number of sites where adult businesses can locate).  And Zibtluda could hardly argue, if the 2001 Ordinance is found to be aimed at secondary effects, that the 2001 Ordinance does not serve a substantial governmental purpose, because it is well established that "[c]ombating the harmful secondary effects of adult businesses, such as increased crime and neighborhood blight, is a substantial government interest."  Lady J. Lingerie, Inc. v. City of Jacksonville, 176 F.3d 1358, 1361 (11th Cir. 1999).

In determining whether the 2001 Ordinance is properly treated as content-neutral, the key question is whether the county has demonstrated that the purpose

of the 2001 Ordinance is to combat negative secondary effects of adult businesses. As we have explained, "[t]he secondary effects doctrine conceived by the Supreme Court is used to determine whether a statute is content-based, by looking for a legislative purpose independent of the legislature's hostility to the underlying message." Ranch House, 238 F.3d at 1280 (emphasis omitted). The evidentiary threshold the county faces in establishing this purpose is not high. The Court in Renton found content neutrality sufficiently demonstrated by the fact that the "predominate concerns" of the city council implementing the ordinance were with the secondary effects of adult movie theaters. Renton, 475 U.S. at 47-48, 106 S. Ct. at 929. In concluding that secondary effects were the predominate concerns, the Court looked no further than the ordinance itself, which recited as its purpose the protection and preservation of the quality of life in the city. See id. at 48, 106 S. Ct. at 929.

In the next part of its analysis – determining whether the ordinance served a substantial government purpose – the Renton Court elaborated further on the secondary effects rationale, but the Court did not establish any more exacting requirement. The Court specifically rejected the insistence of the court of appeals that the city rely on studies specifically relating to the problems of Renton, because that would be "an unnecessarily rigid burden of proof." Id. at 50, 106 S. Ct. at 930.

18

The Renton Court reasoned that the city could rely on the experiences of other cities: "The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." Id. at 51-52, 106 S. Ct. at 931 (emphasis added).

We have echoed Renton and explained that "[t]he government need only have a 'reasonable basis' . . . for believing that its policy will indeed further a legitimate interest." Artistic Entertainment, Inc. v. City of Warner Robins, 223 F.3d 1306, 1309 (2000). This basis can consist of "the experience of other cities, studies done in other cities, caselaw reciting findings on the issue, as well as [the officials'] own wisdom and common sense." Id. (alteration in original) (citation and internal quotation marks omitted). We have expressed this modest standard in these terms: "We do not conceive of this burden as a rigorous one. Nevertheless, [the enacting body] must cite to some meaningful indication – in the language of the code or in the record of legislative proceedings – that the legislature's purpose in enacting the challenged statute was a concern over secondary effects rather than merely opposition to proscribed expression." Ranch House, 238 F.3d at 1283.

The 2001 Ordinance, on its face, meets this burden. The first section of the

19

2001 Ordinance states that its purpose is to combat the well-documented secondary

effects of adult entertainment businesses:

> Based on the experiences of other counties and municipalities, including, but not limited to, Austin, Texas and Garden Grove, California, which experiences are found to be relevant to the problems faced by Gwinnett County, Georgia; and based on the documentary evidence and oral testimony presented by a law enforcement professional and an expert in economic development, both of whom are familiar with conditions resulting in other localities, at the board of commissioners' hearing on July 17, 2001; and based on the evidence and testimony of persons who have appeared before members of the county board of commissioners on other occasions including the public hearing conducted on May 26, 1998 and on documentary evidence submitted to the board of commissioners, the county board of commissioners takes note of the well-known and self-evident conditions and secondary effects attendant to the commercial exploitation of human sexuality, which do not vary greatly among the various communities within our country.

2001 Ordinance § 86-70. The board of commissioners expressly found that nudity

in adult establishments "begets criminal behavior and tends to create undesirable

community conditions"; "establishments offering cinematographic or videographic

adult entertainment have the same deleterious effects on the community"; adult

entertainment contributes to criminal behavior, including "disorderly conduct,

prostitution, public solicitation, public indecency, drug use and drug trafficking";

adult establishments, including adult bookstores, video stores, and theaters,

contribute to "undesirable community conditions," including "depression of

property values and acceleration of community blight in the surrounding

neighborhood, increased allocation of and expenditure for law enforcement personnel to preserve law and order, and increased burden on the judicial system as a consequence of the criminal behavior hereinabove described." Id. Accordingly, the board of commissioners found that it was "in the best interests of the health, welfare, safety and morals of the community and the preservation of its businesses [and] neighborhoods ... to prevent or reduce the adverse impacts of adult entertainment establishments," through licensing and regulation. Id.

These findings are facially sufficient to meet the low evidentiary burden local governments face when enacting ordinances to ameliorate secondary effects of adult businesses, but individuals challenging such ordinances must be afforded the opportunity to "cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale, or by furnishing evidence that disputes the municipality's factual findings." Peek-A-Boo Lounge, 337 F.3d at 1265 (quoting Alameda Books, 535 U.S. at 438-39, 122 S. Ct. at 1736 (plurality opinion of O'Connor, J.)). Zibtluda does not in any way dispute the soundness of the secondary effects rationale of the County. It neither questions the accuracy of the studies and testimony on which the County purports to rely, nor presents any evidence contradicting those findings. Instead, Zibtluda argues that ameliorating secondary effects was not true motive of the County in enacting the

21

2001 Ordinance, and the County instead was motivated by a desire to suppress the protected speech that is attendant to adult entertainment.

Zibtluda asserts that three circumstances prove that the County had an ulterior motive. First, Zibtluda notes that the county enacted the 2001 Ordinance within 24 hours of "learning of Zibtluda's intention to open additional bookstores." Zibtluda does not elaborate on this circumstance, but presumably it refers to when John Cornetta obtained one license to operate an adult bookstore on July 16, 2002, and told County licensing officials that he would be back the following day with more applications. Zibtluda suggests that the County rushed its adoption of the 2001 Ordinance to avoid granting these additional licenses.

The second circumstance that Zibtluda cites is that "[t]he County enforced the zoning and licensing provisions of the May 26, 1998 Ordinance against Zibtluda on the morning of July 17, 2001," when it applied for additional adult business licenses, even though a district court had enjoined enforcement of the zoning provisions of that ordinance on July 13, 2001. Again, Zibtluda offers little elaboration. Although Zibtluda does not say as much, presumably it is suggesting that the County improperly applied the invalidated ordinance to stall Zibtulda's efforts to obtain additional licenses until a new ordinance was in effect.

Zibtluda's third argument is that the county "intentionally ignored Georgia

Zoning Procedures Law" (GZPL), which specifies procedures municipalities must follow when enacting "zoning ordinances." It is undisputed that the County did not follow the GZPL in enacting the July 17, 2001 Ordinance. Notably, Zibtluda does not afford any independent significance to the failure of the County to follow the GZPL – that is, Zibtluda does not argue that this failure alone invalidates the 2001 Ordinance. Zibtluda only suggests that abandoning the GZPL was a way to help the County speed along passage of the new 2001 Ordinance.

It is beyond dispute that targeting the speech itself is impermissible. "[A] city may not regulate the secondary effects of speech by suppressing the speech itself." Alameda Books, 535 U.S. at 445, 122 S. Ct. at 1739 (Kennedy, J., concurring). "The purpose and effect of a zoning ordinance must be to reduce secondary effects and not to reduce speech." Fly Fish, 337 F.3d at 1310. The argument of Zibtluda that the County targeted speech fails, however.

There are two problems with the arguments of Zibtluda. First, Zibtluda does not even attempt to establish that any regulations contained in the 2001 Ordinance suppress or reduce speech. Zibtluda has not endeavored to prove, for example, that any adult businesses have been or will be forced to close or to scale back their operations as a result of the 2001 Ordinance. Zibtluda has neither clarified why it was denied two of the four additional licenses for which it applied, nor has it

23

established that the reason was some speech-suppressing element in the new 2001 Ordinance. The record does not show that the County attempted to "regulate the secondary effects of speech by suppressing the speech itself."

Second, Zibtluda's proffered evidence of improper motive is entirely circumstantial, inferential, and remote. As noted above, the Supreme Court has provided that aggrieved parties may challenge the secondary effects rationale "either by demonstrating that the municipality's evidence does not support its rationale, or by furnishing evidence that disputes the municipality's factual findings." Peek-A-Boo Lounge, 337 F.3d at 1265 (quoting Alameda Books, 535 U.S. at 438-39 (plurality opinion of O'Connor, J.)). Zibtluda has not established improper motive through this kind of circumstantial evidence.

The Supreme Court in Renton declined to afford any significance to the fact that the city might have some other "motivating factor" beyond the "predominate concerns" of alleviating secondary effects. The Renton Court observed that this view had already been rejected in United States v. O'Brien, which stated that "[i]t is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." Renton, 475 U.S. at 47-48, 106 S. Ct. at 929 (quoting O'Brien, 391 U.S. 367, 383, 88 S. Ct. 1673, 1682 (1968)). We have explained that "[i]n determining whether

24

the purpose of a law is to suppress protected speech, a court may examine a wide variety of [objective] materials, including the text of the statute, any preamble or express legislative findings associated with it, legislative history, and studies and information of which legislators were clearly aware." Ranch House, 238 F.3d at 1280 (citing Colacurico v. City of Kent, 163 F.3d 545, 552 (9th Cir. 1998)). We have observed that "[c]ourts are hesitant to inquire into legislators' motives, however, and we will 'not strike down an otherwise constitutional statute on the basis of an alleged legislative illicit motive.'" Artistic Entertainment, 223 F.3d at 1309 (quoting O'Brien, 391 U.S. at 383, 88 S. Ct. at 1682 and rejecting an attempt to cast doubt on whether a nudity ordinance was really motivated by secondary effects). Because Zibtluda established no basis for concluding that the 2001 Ordinance was motivated by any purpose other than to ameliorate the secondary effects of adult businesses, the district court properly reviewed the 2001 Ordinance under intermediate scrutiny.

## IV.  CONCLUSION

Because the 2001 Ordinance affords an aggrieved applicant for a license to operate an adult entertainment business an assurance of a prompt judicial decision and the County adopted the 2001 Ordinance to combat the secondary effects of adult businesses, this facial challenge to the 2001 Ordinance fails. The district

25

court is

**AFFIRMED.**