[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-15354

_____

D.C. Docket No. 4:13-cv-10103-JEM

BRAD BUEHRLE,

Plaintiff-Appellee,

versus

CITY OF KEY WEST,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 29, 2015)

Before MARCUS, WILLIAM PRYOR and JILL PRYOR, Circuit Judges.

JILL PRYOR, Circuit Judge:

The City of Key West, Florida has barred Brad Buehrle from opening a

tattoo establishment in the City's designated historic district, pursuant to an

ordinance strictly limiting the number of tattoo establishments permitted to operate there. Mr. Buehrle contends that the act of tattooing is entitled to First Amendment protection and that the ordinance is an unconstitutional restriction on his freedom of expression. The district court granted summary judgment to the City, agreeing with Mr. Buehrle that tattooing constitutes artistic expression protected by the First Amendment but nevertheless finding the ordinance to be a reasonable time, place, and manner restriction. We agree with the district court's conclusion that tattooing is protected artistic expression, but we reverse the summary judgment because, on the record before us, the City has failed to show that the ordinance is a reasonable time, place, and manner restriction.

## I. BACKGROUND

Mr. Buehrle wished to open a tattoo establishment in the City's historic district. After negotiating a lease to rent commercial space there, he attempted to file an application with the City for a business license. The City denied Mr. Buehrle's application. The City prohibits tattoo establishments in the historic district, *see* Key West, Fla., Code of Ordinances, subpart A, § 42-6(a), and allows tattoo establishments only in the General Commercial District as a "conditional use," *see id.* subpart B, § 122-418(21).

The island of Key West has a history of restricting the operation of tattoo establishments. From 1966 to 2007, there was a blanket prohibition on operating

any tattoo establishments on the island.  According to local lore, this ban arose at the request of the United States Navy, which feared that its sailors would obtain ill-advised tattoos.  Today, the City permits only two tattoo businesses to operate in the historic district as lawful non-conforming uses; it allowed these as part of the settlement of a prior lawsuit challenging the constitutionality of the ban.  The City maintains that, given its history, tattoo establishments are inconsistent with the district's historic character.  It also fears that rash tourists will obtain regrettable tattoos, leading to negative association with Key West.  Thus, it argues, permitting more tattoo establishments will adversely affect tourism.

Mr. Buehrle filed suit in state court in Monroe County, Florida.  The City removed the action to the United States District Court for the Southern District of Florida.  After conducting discovery, the parties filed cross-motions for summary judgment.  The district court granted the City's motion and denied Mr. Buehrle's, concluding that although the act of tattooing constitutes protected speech, the City's ordinance was content neutral and constituted a reasonable time, place, and manner restriction.  This is Mr. Buehrle's appeal.

## II. DISCUSSION

### A.  *Tattooing as Artistic Expression*

The First and Fourteenth Amendments prohibit states from making any law abridging the freedom of speech.  U.S. Const. amends. I, XIV; *Bd. of Regents of*

3

*State Colls. v. Roth*, 408 U.S. 564, 581 (1972). This protection "does not end at the spoken or written word," *Texas v. Johnson*, 491 U.S. 397, 404 (1989), but extends to various forms of artistic expression. *See Kaplan v. California*, 413 U.S. 115, 119-20 (1973) ("[P]ictures, films, paintings, drawings, and engravings . . . have First Amendment protection . . . ."); *see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995) (noting that the First Amendment "unquestionably shield[s]" the "painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll"). Although the Supreme Court has never explicitly defined the entire universe of artistic expression safeguarded by the First Amendment, it has cast the amendment's protections over a variety of artistic media, including movies, *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501-02 (1952); music without words, *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989); and nude dancing, *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 66 (1981).

We have never addressed whether tattooing is a protected form of artistic expression. The Ninth Circuit encountered this issue in *Anderson v. City of Hermosa Beach*, where it held that tattooing was protected speech and that Hermosa Beach constitutionally could not ban tattoo establishments from operating in the city. 621 F.3d 1051, 1055 (9th Cir. 2010). We join the Ninth Circuit in holding that the act of tattooing is sheltered by the First Amendment, in large part

because we find tattooing to be virtually indistinguishable from other protected forms of artistic expression. As our sister circuit observed, "[t]he principal difference between a tattoo and, for example, a pen-and-ink drawing, is that a tattoo is engrafted onto a person's skin rather than drawn on paper. . . . [A] form of speech does not lose First Amendment protection based on the kind of surface it is applied to." *Id.* at 1061.

The City points us to a number of district and state court decisions drawing a distinction between the process of creating a tattoo and the tattoo itself. These courts reason that the act of wearing a tattoo is communicative, and consequently protected speech, but that the process of tattooing is not. *See, e.g.*, *Hold Fast Tattoo, LLC v. City of North Chicago*, 580 F. Supp. 2d 656, 660 (N.D. Ill. 2008); *Yurkew v. Sinclair*, 495 F. Supp. 1248, 1253-54 (D. Minn. 1980); *State v. White*, 560 S.E.2d 420, 423 (S.C. 2002). In the opinion of these courts, a tattoo artist's "interest in engaging in conduct involving tattooing does not rise to the level of displaying the actual image conveyed by the tattoo, as the tattoo itself is clearly more communicative, and would be regarded as such by the average observer, than the process of engrafting the tattoo on the recipient." *Yurkew*, 495 F. Supp. at 1254. This, these courts explain, is because "[t]he act of tattooing . . . is not intended to convey a particularized message. The very nature of the tattoo artist is to custom-tailor a different or unique message for each customer to wear on the

5

skin." *Hold Fast Tattoo*, 580 F. Supp. 2d at 660.  As such, "[t]he act of tattooing is one step removed from actual expressive conduct" because, although it can be used to convey a message, it is the customer's message being conveyed, not the tattoo artist's. *Id.*

These decisions treat the First Amendment's protection as a mantle, worn by one party to the exclusion of another and passed between them depending on the artistic technique employed, the canvas used, and each party's degree of creative or expressive input.  But the First Amendment's safeguards are not so neatly cabined.  Protected artistic expression frequently encompasses a sequence of acts by different parties, often in relation to the same piece of work.  The First Amendment protects the artist who paints a piece just as surely as it protects the gallery owner who displays it, the buyer who purchases it, and the people who view it.  *See Griswold v. Connecticut*, 381 U.S. 479, 482 (1965) ("The right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read . . . .").

Any other interpretation of the First Amendment in this context would deprive it of the force and effect the Supreme Court has told us it deserves.  *See Ward*, 491 U.S. at 790.  A regulation limiting the creation of art curtails expression as effectively as a regulation limiting its display.  The government need not ban a protected activity such as the exhibition of art if it can simply proceed upstream

6

and dam the source.  Consistent with the Supreme Court's teaching, the right to *display* a tattoo loses meaning if the government can freely restrict the right to *obtain* a tattoo in the first place.  *See Anderson*, 621 F.3d at 1062 ("[T]he tattoo cannot be created without the tattooing process . . . . Thus, as with writing or painting, the tattooing process is inextricably intertwined with the purely expressive product (the tattoo), and is itself entitled to full First Amendment protection.").  For this reason, the Supreme Court has never "drawn a distinction between the process of creating a form of pure speech (such as writing or painting) and the product of these processes (the essay or the artwork) in terms of the First Amendment protection afforded."  *Id.* at 1061 (emphasis omitted); *see also Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116-18 (1991) (First Amendment protects both the act of writing content and the act of publishing it).

  We suspect the idea that a tattoo represents the expression of the wearer and not the tattoo artist may spring from an outmoded perception of the tattoo industry. During the 1960s, tattoo artists began evolving the craft of tattooing beyond the rote application of standardized designs that historically characterized the medium. *See* Ryan J. Walsh, Comment, *Painting on a Canvas of Skin:  Tattooing and the First Amendment*, 78 U. Chi. L. Rev. 1063, 1090-91 (2011).  Today, tattooing as practiced by a large segment of tattoo artists "emphasizes creativity and

expression" and is "quite self-consciously an expressive movement."  *Id*.  As one

commentator writes,

> [T]attooing has become a leading art form . . . and the subject of museum exhibits throughout the United States.  Today, tattoo artists are known for their large-scale, unified, custom designs, and some have even sought copyrights for their finished pieces. Currently, most tattoo artists are graduates of college art programs who seek the intrinsic appeal of the medium and desire to break free from the limitations, distortions and irrelevance of conventional elitist modes of art production.

Carly Strocker, Comment, *These Tats Are Made for Talking:  Why Tattoos and*

*Tattooing Are Protected Speech Under the First Amendment*, 31 Loy. L.A. Ent. L.

Rev. 175, 187 (2011) (footnotes and internal quotation marks omitted).  Mr.

Buehrle and his work appear to be of this ilk, and we see no meaningful basis on

which to distinguish his work from that of any other artist practicing in a visual

medium, certainly not a basis sufficient to deny him First Amendment protection.

B.  *Reasonable Time, Place, and Manner Restriction*

Having decided that tattooing is artistic expression protected by the First

Amendment, we must determine whether the City's municipal ordinance limiting

that expression is constitutional.  A municipality may regulate protected artistic

expression only if the regulation (1) is justified without reference to the content of

the regulated speech, (2) is narrowly tailored to serve a significant governmental

interest, and (3) leaves open ample alternative channels for communication of the

information.  *Ward*, 491 U.S. at 791.  Mr. Buehrle concedes the ordinance is

content-neutral.  Thus, we need only scrutinize the ordinance under the latter two factors.  Because we conclude that the City has failed to demonstrate that the ordinance serves a significant governmental interest, we do not address whether it leaves open ample alternative channels of communication.

The City argues that the ordinance's purpose is to prevent the deterioration of the historic district.  Specifically, the City fears that allowing additional tattoo establishments to operate in the historic district would adversely impact the "character and fabric" of the district and thus the tourism that the district attracts. We do not doubt that these are substantial government interests.  *See One World One Family Now v. City of Miami Beach*, 175 F.3d 1282, 1288 (11th Cir. 1999) ("There is . . . no question that the city's further interest in creating an aesthetic ambiance which will attract tourists . . . is a substantial government interest, especially where, as here, a designated historic area is at issue."); *Messer v. City of Douglasville,* 975 F.2d 1505, 1510 (11th Cir. 1992) ("A government has a more significant interest in the aesthetics of designated historical areas than in other areas.").

Our inquiry does not end there, however.  We do not simply take the City at its word that the ordinance serves the aforementioned interests.  Instead, the City must demonstrate that it had a reasonable basis for believing that its regulation would further these legitimate interests.  *See Zibtluda, LLC v. Gwinnett Cty. ex rel.*

9

*Bd. of Comm'rs*, 411 F.3d 1278, 1286 (11th Cir. 2005).  This burden is not a

rigorous one.  *Id.*  But a municipality cannot "get away with shoddy data or

reasoning."  *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002)

(plurality opinion).  It "must rely on at least *some* pre-enactment evidence" that the

regulation would serve its asserted interests.  *Peek-A-Boo Lounge of Bradenton,*

*Inc. v. Manatee Cty.*, 337 F.3d 1251, 1268 (11th Cir. 2003); *see also Zibtluda*, 411

F.3d at 1286 ("Nevertheless, [the enacting body] must cite to *some* meaningful

indication—in the language of the code or in the record of legislative

proceedings—that the legislature's purpose in enacting the challenged statute was

a concern over secondary effects rather than merely opposition to proscribed

expression.") (alteration in original) (quoting *Ranch House, Inc. v. Amerson*, 238

F.3d 1273, 1283 (11th Cir. 2001)).  Such evidence can include anything

"reasonably believed to be relevant—including a municipality's own findings,

evidence gathered by other localities, or evidence described in a judicial opinion."

*Peek-A-Boo Lounge*, 337 F.3d at 1268 (internal quotation marks omitted).

The City has failed to meet its burden.  Aside from the ordinance's vague

statement of purpose,[1] the only support for the City's claim that the ordinance

---

[1] An ordinance's statement of purpose may demonstrate that the ordinance serves a significant governmental interest if the statement of purpose is sufficiently detailed and supported with evidence. *See Zibtluda*, 411 F.3d at 1286-87 (upholding an ordinance based on its statement of purpose, which cited to experiences of other counties and municipalities, documentary evidence, and oral testimony).  Here, though, the ordinance's statement of purpose refers to no evidence and contains no detail beyond its general assertion that limiting the number

10

serves significant governmental interests consists of statements by Donald Craig, the City's Director of Planning. In his deposition and an affidavit submitted in support of the City's motion for summary judgment, Mr. Craig asserted that: Key West historically prohibited tattoo establishments from operating in the historic district; allowing tattoo establishments to operate there would impact the district's "character and fabric," which "could . . . impact tourism"; and tourists might negatively associate Key West with tattoos that they had obtained there but come to regret.

As an initial matter, Mr. Craig's reasons were given in the context of Mr. Buehrle's lawsuit, well after the enactment of the ordinance. They therefore cannot serve as *pre-enactment* evidence that the ordinance serves a significant governmental interest. *See Peek-A-Boo Lounge*, 337 F.3d at 1268; *see also Zibtluda*, 411 F.3d at 1286. Even were that not the case, we would still find Mr. Craig's statements inadequate because they are, by and large, unsubstantiated. It is undisputed that there was a blanket prohibition on the operation of tattoo establishments on the island of Key West from 1966 to 2007, but nothing in the record corroborates Mr. Craig's assertions about the prohibition's origin or tells us whether any tattoo establishments operated in the area prior to 1966.

---

of tattoo establishments will prevent "the potential deterioration of a preserved historic district; an increase in the incidence of disease; and land use incompatibilities." Key West, Fl., Code of Ordinances, subpart B, § 122-1543(a). On appeal, the City argues only deterioration of a preserved historic district.

Significantly, the mere fact that Key West successfully prohibited tattoo establishments in the historic district for approximately forty years does not support the conclusion that allowing more tattoo establishments would cause the district's historical value to deteriorate and impact tourism. To the contrary, the City's recent experience suggests otherwise. The City concedes the absence of any ill effect as a result of the two tattoo establishments it currently allows to operate in the historic district. And it fails to explain why allowing additional tattoo establishments to operate there would sour the district's historical flavor, especially since the first two apparently have not done so.

Particularly glaring is the lack of evidentiary support for the City's assertions concerning tattooing's purported effect on tourism. The City pointed to no study indicating that the operation of tattoo establishments in the historic district would impact the tourism industry. The City conducted no investigation and made no findings. It relied upon no expert testimony, findings made by other municipalities, or evidence described in judicial decisions. It failed to muster even anecdotal evidence supporting its claims. The closest the City came to presenting evidence on the impact on tourism was a passing reference to a few lines of a

12

Jimmy Buffett song.  And we are unsure whether even that reference fully supports its position.[2]

The First Amendment requires more.  We are not at liberty simply to "presume the evidence" needed to sustain the ordinance.  *Peek-A-Boo Lounge*, 337 F.3d at 1267.  "[T]he government bears the burden of showing that the articulated concern has more than merely speculative factual grounds."  *Flanigan's Enters., Inc. v. Fulton Cty.*, 242 F.3d 976, 986 (11th Cir. 2001).[3]  The City failed to satisfy this burden.  On the record before us, the City has presented insufficient evidence that it had a reasonable basis for believing that its ordinance would actually serve the significant governmental interests it propounds.  Perhaps, if the district court chooses to permit the introduction of new evidence on remand, the City can produce the kind of evidence that would satisfy its burden, but so far it has not done so.

---

[2] Jimmy Buffett's song "Margaritaville" was referenced twice in the record, once by Mr. Craig in his deposition and once by the City's attorney in oral argument before the district court, to support the claim that inebriated tourists are likely to get and then regret tattoos if more tattoo establishments operate in the historic district.  But the singer in "Margaritaville"—seemingly far from suffering embarrassment over his tattoo—considers it "a real beauty."  Jimmy Buffett, "Margaritaville," on *Songs You Know by Heart* (Geffen Records 1985).

[3] Although the decision in *Flanigan's Enterprises* was ultimately superseded on other grounds by a county ordinance, Fulton County, Ga., Code § 18–79(17), *see Flanigan's Enters., Inc. of Ga. v. Fulton Cty.*, 596 F.3d 1265 (11th Cir. 2010), it remains valid for the cited proposition.

### III. CONCLUSION

The district court erred when it concluded that the City's municipal ordinance restricting the number of tattoo establishments in its historic district was a reasonable time, place, and manner restriction on protected expression. We reverse the grant of summary judgment and remand the case to the district court for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**