**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 21-12776

————————————————

WBY, INC.,
d.b.a. Follies,

*Plaintiff-Counter Defendant,*
*Appellant,*

*versus*

CITY OF CHAMBLEE, GEORGIA,

*Defendant-Counter Claimant,*
*Appellee.*

————————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:18-cv-05748-SDG

————————————————

Before ROSENBAUM, LAGOA, Circuit Judges, and SINGHAL,[*] District Judge.

LAGOA, Circuit Judge:

WBY, Inc. owns Follies, a strip club, located in the City of Chamblee, Georgia. Follies challenges certain City ordinances relating to the sale of alcohol at adult establishments with nude dancing. Follies asserts that these ordinances violated rights guaranteed to it by the Contract Clause and the First and Fourteenth Amendments of the United States Constitution. At issue are two orders entered by the district court: (1) an order dismissing some of Follies' claims for lack of standing, and (2) a subsequent order granting summary judgment to the City on Follies' remaining Contract Clause, free speech, and equal protection claims.

After careful review, and with the benefit of oral argument, we affirm the district court's orders on appeal.

## I.      FACTUAL AND PROCEDURAL HISTORY

### A.  Follies and DeKalb County

Follies, an adult establishment offering nude dancing and alcohol, opened in 1992 in unincorporated DeKalb County, Georgia. Over the next decade, Follies, along with other adult entertainment establishments, litigated against DeKalb County over the validity of certain ordinances that harmed the establishments' business

---

[*] Honorable Anuraag Singhal, United States District Judge for the Southern District of Florida, sitting by designation.

model, including one ordinance that banned the sale of alcohol at establishments offering nude dancing. In June 2001, Follies, as well as the other adult entertainment establishments, and DeKalb County entered into a Settlement and Release Agreement (the "Agreement"). Pursuant to the Agreement, Follies and the other businesses released and dismissed their pending damages claims against DeKalb County in exchange for the right to offer both nude dancing and alcohol consumption on their premises for a term of eight years. The parties also agreed that the adult establishments would pay a graduated licensing fee as consideration for the Agreement.

In May 2007, Follies and the other DeKalb County adult establishments amended their Agreement with the County (the "amended Agreement"). Under the amended Agreement, Follies and the other businesses were granted non-conforming status, meaning they could continue to sell alcohol and present nude dancing at their premises for a period of fifteen years, until December 31, 2021, unless extended by agreement of the parties. In addition, the amended Agreement required the businesses to pay an annual license fee starting at $100,000 for the first ten years and increasing to $150,000 for the final five years of the amended Agreement. The adult entertainment establishments, including Follies, also agreed to pay an annual fee during the terms of the amended Agreement. Other than the grant of non-conforming status, the amended Agreement created no other rights. Nothing in this amended Agreement prohibited DeKalb County from "adopting, amending or otherwise regulating any and all matters relating to the

operation of Adult Clubs." The amended Agreement was set to expire in 2022, but it provided that it could be renewed. The parties to the amended Agreement also contemplated a transfer of authority from DeKalb County to another governmental body, in which event the terms of Follies' non-conforming status would still apply. In relevant part, the amended Agreement states:

> This agreement shall be binding upon any governmental body to which the County transfers regulatory control over the matters herein, expressly including any municipality which obtains jurisdiction by incorporation or annexation. The allowable uses herein shall be considered as ongoing actual uses by any such successor assign. For purposes of this agreement the term "non-conforming status" shall mean that the Adult Clubs will be permitted to sell alcoholic beverages (subject to all other laws and regulation of alcohol) and to provide adult entertainment in the form of nude dancing or live nude performances.

### B. The City of Chamblee and Follies

The City of Chamblee is located in the northern portion of DeKalb County, Georgia, northeast of Atlanta. On November 5, 2013, the City voted to annex land in DeKalb County, which included Follies' property. As a result of the annexation, the City gained about 12,000 new residents, as well as a number of late night establishments that were routinely open past midnight. Of those businesses, only Follies offered nude dancing.

The City subsequently adopted a resolution addressing Follies and the amended Agreement between DeKalb County and Follies. The resolution stated that: (1) Follies is in violation of current City ordinances; (2) Follies had nonconforming status allowing Follies to continue to serve alcohol at an adult nude performance location pursuant to the amended Agreement; (3) the City saw no benefit in spending its tax dollars on additional lawsuits when others are pending; (4) the amended Agreement was not binding on the City; (5) the City did not waive its right to discontinue abiding by the existing Agreement at any time in the future; and (6) the City would abide by the terms of the amended Agreement temporarily until the legal issues were determined.

Following the City's annexation of Follies and the subsequent adoption of the resolution discussed above, the City abided by the amended Agreement and issued liquor licenses to Follies, which continued to operate as a nude dancing establishment and serve alcohol, in 2015, 2016, 2017, and 2018. Pursuant to the amended Agreement, Follies made annual payments of $100,000 to the City in 2016 and 2017. In 2018, Follies paid the increased amount of $150,000 to the City pursuant to the amended Agreement. Each alcohol license that the City issued to Follies during this period contained the following language in a notice at the bottom of the page:

> Notice: The issuance of this license shall not in any way serve to imply or acknowledge that the City of Chamblee believes that the 2007 settlement agreement between DeKalb County and its adult clubs is

6                     Opinion of the Court                21-12776

binding upon the City of Chamblee. Furthermore, pursuant to a Resolution of the Chamblee City Council passed April 15, 2014, the City chooses to temporarily abide by the 2007 settlement agreement but by doing so does not waive its right to discontinue abiding by the agreement at any time in the future.

Along with the payments, Follies ensured that its employees and contractors all paid the City for and obtained annually issued adult entertainment work permits. In order to satisfy the local ordinance requirement that 50% of its sales be from food and non-alcoholic beverages in order to qualify for an alcohol license, Follies testified that it engaged in the following business practice:

> We pair a food item with an alcoholic beverage. To get the alcoholic beverage you have to also purchase the food item. We assign a cost to the food item and also a cost to the alcoholic beverage. So when they are rung up, the bartender hits two keys, one for food, one for alcohol. And the only rule there that we have to abide by that I know of is that we're not allowed to sell alcohol for less than we [buy] it for, and we're very careful never to do that. And that's how we meet those food percentage requirements . . . .

The relationship between Follies and the City began to deteriorate in 2018. On or shortly before February 17, 2018, City police officers, accompanied by the DeKalb County's fire marshal's office and the Georgia Department of Revenue, executed a search warrant on Follies' premises. At around 12:45 a.m. on February 17, peak hours for Follies, the City executed the search warrant,

blocking the front door and back exits, stationing cars outside, and checking whether Follies had an alcohol license, a business license, and a tobacco certificate (for the cigarette vending machine). The City's employees left Follies at around 2:00 a.m. During the search, an officer discovered a fire extinguisher that was not working properly and issued a citation. An officer also discovered that Follies was selling liquor by the bottle and issued another citation. The validity of this search was challenged in *DeKalb Events Ctr., Inc. v. City of Chamblee*, No. 1:18-cv-2739-SDG (N.D. Ga. filed June 4, 2018). Summary judgment was granted in favor of the City and its police officers on January 16, 2020. *Id.*

### C. The City Amends Its Municipal Codes

Following the search, the City adopted Ordinance 745, amending Alcohol Code § 6-152(a). Ordinance 745 required businesses to stop serving alcoholic beverages by 2:00 a.m. (11:59 p.m. on Sunday nights) and to close by 2:30 a.m. Follies challenged the constitutionality of this ordinance in federal court in the same suit as the challenge to the police search.

In the Fall of 2018, the City further amended its laws governing adult establishments that served alcohol, adopting Ordinance 752 and Ordinance 754 (the "challenged ordinances"). Ordinance 752 governs adult entertainment and imposes three relevant restrictions.[1] First, it prohibits "any patron, employee, or any other

---

[1] The relevant text of Ordinance 752 reads:

person" from "knowingly, or intentionally, in an adult establishment, appear[ing] in a state of nudity or engag[ing] in a specified sexual activity." The amendment to the adult code defines nudity as follows:

> [T]he showing of the human male or female genitals, pubic area, vulva, or anus with less than a fully

---

Sec. 22-115. – Prohibited conduct.

(a) No patron, employee, or any other person shall knowingly or intentionally, in an adult establishment, appear in a state of nudity or engage in a specified sexual activity.

(b) No personal shall knowingly or intentionally, in an adult establishment, appear in a semi-nude condition unless the person is an employee who, while semi-nude, remains at least six (6) feet from all patrons and on a stage at least eighteen (18) inches from the floor in a room of at least six hundred (600) square feet.

(c) No employee who appears semi-nude in an adult establishment shall knowingly or intentionally touch a customer or the clothing of a customer on the premises of an adult establishment. No customer shall knowingly or intentionally touch such an employee or the clothing of such an employee on the premises of an adult establishment.

(d) After December 31, 2018, no person shall possess, use, or consume alcoholic beverages on the premises of an adult establishment.

. . .

Sec. 22-118. – Hours of operation.

No adult establishment shall be or remain open for business between 12:00 midnight and 6:00 a.m. on any day.

> opaque covering, or the showing of the female breast with less than a fully opaque covering of any part of the nipple and areola. For purposes of this article, a 'fully opaque covering' must be non-flesh colored, shall not consist of any substance that can be washed off the skin, such as paint or make-up, and shall not simulate the appearance of the anatomical area that it covers.

An "adult establishment" is an "adult arcade," an "adult bookstore," an "adult motion picture theater," a "semi-nude lounge," or a "sex paraphernalia store."

Second, Ordinance 752 states that after December 31, 2018, "no person shall possess, use, or consume alcoholic beverages on the premises of an adult establishment."

And third, Ordinance 752 states that "[n]o adult establishment shall be or remain open for business between 12:00 midnight and 6:00 a.m. on any day."

Ordinance 754 changed the requirements for establishments to qualify as a restaurant, a prerequisite to obtaining an alcohol license.[2]     Ordinance 754 categorically prohibited adult

---

[2] The relevant text of Ordinance 754 reads as follows:

Sec. 6-142. – Restaurant.

(a) To be eligible for, and to operate under, a consumption on the premises license as a restaurant, an establishment must:

establishments from obtaining liquor licenses.  Ordinance 754 also required an applicant to "[d]erive at least 50 percent of total *revenue* from the sale of food prepared and consumed on the premises and nonalcoholic beverages consumed on the premises." (emphasis added).  Under the prior version of the City's ordinances, an establishment had to "[d]erive at least 50 percent of total *sales* from the sale of food and nonalcoholic beverages consumed on the premises, exclusive of sales from vending machines" to qualify as a restaurant (emphasis added).[3]  Pursuant to Ordinance 754, if an

> (1) Be used and held out to the public as a place where meals are regularly served to the public for adequate pay
>
> (2) Contain one or more public dining rooms, with tables and seating that occupy (at all times that the establishment is occupied by patrons) at least seventy percent (70%) of the floor area in the establishment that is accessible to patrons, and have full-service kitchen facilities and adequate staff to prepare, cook, and serve suitable food for its guests;
>
> . . .
>
> (5) Derive at least 50 percent of total revenue from the sale of food prepared and consumed on the premises and nonalcoholic beverages consumed on the premises.  For purposes of this subsection, if an establishment requires customers to pay a minimum charge to enter or remain on the premises, the amount so charged shall not be counted toward the 50 percent requirement.

[3] Ordinance 754 also amended the sale requirement so that restaurants not only needed to sell food for consumption on the premises, but also needed to prepare that food on the premises. Before Ordinance 754, a restaurant seeking a liquor license had to "[d]erive at least 50 percent of total sales from the sale

21-12776　　　　　　　Opinion of the Court　　　　　　　11

application is denied, the applicants listed in the application may not reapply for a license for at least one year from the final date of the denial.

Prior to the City Council's consideration of the challenged ordinances, the City Manager, Jonathan Walker, emailed the Mayor and City Council advising them that the ordinances were "[p]atterned after those adopted in Sandy Springs, Doraville, and Brookhaven, which have been upheld against various challenges by the Georgia Supreme Court and the U.S. Court of Appeals for the Eleventh Circuit."

In addition, during the summer of 2018, Marci Hooper-Smith, the administrative assistant to the City Clerk, Emmie Niethammer, emailed Niethammer with the message: "Supreme Court rejected Sandy Springs case for adult entertainment suit." The email contained a link to a newspaper article that explained how the municipal laws were defended by an attorney, Mr. Bergthold, who "specializes in municipal laws cracking down on sexually oriented businesses." Over the next few weeks, members of the Chamblee City Council, the City Clerk, and the City Manager received news briefings and emails linking to articles about other strip club closings in the area following court rulings.

---

of food and nonalcoholic beverages consumed on the premises." But Ordinance 754 amended that provision to require a restaurant seeking a liquor license to "[d]erive at least 50 percent of total revenue from the sale of food prepared and consumed on the premises and nonalcoholic beverages consumed on the premises."

Prior to adopting the challenged ordinances, the City prepared, received, and considered an extensive evidentiary record. The City relied on 72 judicial decisions and 38 secondary-effects reports documenting the adverse impacts of sexually oriented businesses locally and across the country. For example, the City relied on a 2001 Fulton County study supporting the separation of adult and alcohol-serving establishments; investigator affidavits detailing various crimes, alcohol abuse, drug trafficking, and other events occurring in and around sexually explicit business establishments in Forest Park and Sandy Springs, Georgia; and testimony from DeKalb County police officers concerning the prevalence of prostitution, drug sales, firearm possession, and other crimes at local strip clubs, specifically including Follies. Some of the City's findings were stated in the language of Ordinance 752:

> WHEREAS, adult establishments require special supervision from the public safety agencies of the City in order to protect and preserve the health, safety, and welfare of the patrons of such businesses as well as the citizens of the City; and

> WHEREAS, the City Council finds that adult establishments, as a category of establishments, are frequently used for unlawful sexual activities, including prostitution, and sexual liaisons of a casual nature; and

> WHEREAS, there is convincing documented evidence that adult establishments, as a category of establishments, have deleterious secondary effects and

are often associated with crime and adverse effects on surrounding properties; and

WHEREAS, the City Council desires to minimize and control these adverse effects and thereby protect the health, safety, and welfare of the citizenry; protect the citizens from crime; preserve the quality of life; preserve the character of surrounding neighborhoods and deter the spread of urban blight . . . .

The City also made the following findings regarding the adverse secondary effects of adult establishments, based on the judicial opinions and reports related to such secondary effects in the evidentiary record:

[T]he city council finds:

(1) Adult establishments, as a category of commercial uses, are associated with a wide variety of adverse secondary effects including, but not limited to, personal and property crimes, human trafficking, prostitution, potential spread of disease, lewdness, public indecency, obscenity, illicit drug use and drug trafficking, negative impacts on surrounding properties, urban blight, litter, and sexual assault and exploitation. Alcohol consumption impairs judgment and lowers inhibitions, thereby increasing the risk of adverse secondary effects.

(2) Adult establishments should be separated from sensitive land uses to minimize the impact of their secondary effects upon such uses, and should be separated from other adult establishments, to minimize the secondary effects associated with such uses and to

prevent a concentration of adult establishments in one area.

(3) Each of the foregoing negative secondary effects constitutes a harm which the city has a substantial government interest in preventing and/or abating. This substantial government interest in preventing secondary effects, which is the city's rationale for this article, exists independent of any comparative analysis between sexually oriented and non-sexually oriented businesses. Additionally, the city's interest in regulating adult establishments extends to preventing future secondary effects of either current or future adult establishments that may locate in the city. The city finds that the cases and documentation relied on in this article are reasonably believed to be relevant to said secondary effects.

In response to the new ordinances, Follies prepared to comply with these requirements. The business bought a $4,000, 1,000-pound commercial mixer, along with brownie and cupcake mix, in order to operate a large bakery on the premises. Because Ordinance 754 required food to be prepared on the property for purposes of satisfying the 50 percent requirement, Follies changed from selling prepackaged crackers to selling cupcakes and brownies along with alcoholic purchases. Follies also monitored revenue streams and was prepared to decrease non–prepared food revenue by charging a smaller door fee or eliminating it entirely on some days and by charging smaller fees to entertainers or charging no fees on some days.

### D. The City Denies Follies' 2019 Alcohol License

On March 14, 2019, the City notified Follies of its intention to not renew its alcohol license for the 2019 calendar year. The denial stated that the application could not be granted because it was incomplete for the following reasons: (1) the personnel statement for 50% owner Steven Youngelson is not complete because it is unsigned; (2) the application lacks the email addresses required; (3) the applicant lacks the written consent of the registered agent; (4) the diagrams of the establishment do not contain required information; and (5) the application lacks a sworn statement from a certified public accountant. The notice also states:

> Even if Follies were to have filed a completed application, it would be due to be denied under Chamblee Code Section 6-47 because the establishment is not eligible for a consumption on the premises license as a restaurant. Follies is ineligible because Follies does not derive 50 percent of its total revenue from the sale of food and nonalcoholic beverages prepared and consumed on the premises.
>
> . . . .
>
> A completed application would also be due to be denied under Chamblee Code Section 6-45(j) because Follies is an adult establishment as defined in Chapter 22, Article VI of the Code. Follies is an adult establishment because it meets the definition of a seminude lounge set forth in Section 22-101.

After a hearing, which Follies did not attend, the hearing officer affirmed the denial of Follies' alcohol license. In support of that

denial, the hearing officer found that (1) Follies lacked a full-service kitchen; (2) Follies derived less than 50% of its total revenue from the sale of food and nonalcoholic beverages; (3) Follies is a semi-nude lounge and therefore ineligible for an alcohol license; and (4) Follies did not furnish all information required to apply for the license. Although Georgia law entitled Follies to appeal that decision, Follies declined to do so.

### E. The City Denies Bowlmor's Alcohol License and Amends Municipal Code

In 2018, AMF Bowling Centers, Inc. ("Bowlmor") received an alcohol license renewal from the City. On the face of that application, it appeared that Bowlmor did not meet the 50 percent requirement for food and alcohol revenues because Bowlmor derived 46 percent of their revenue from food and food service and 54 percent of their revenue from alcoholic beverages. In 2019, Bowlmor again received an alcohol license for that calendar year despite submitting another facially deficient application. The City Clerk testified that she learned shortly before her deposition on November 6, 2019, that the Bowlmor license was issued in error. In December 2019, the City informed Bowlmor that its 2020 application would be denied.

Three days after the City sent its notice to Bowlmor, Bowlmor's legal counsel had a conference call with the City Manager and Scott Bergthold, the attorney representing the City in this case. Bowlmor's counsel followed up after that conversation explaining the seriousness of the situation for his client:

21-12776                Opinion of the Court                17

> Thank you for taking my call today. . . . The urgency
> of this matter cannot be understated, as AMF's cur-
> rent City alcohol license will expire on December 31,
> 2019. If it is not the City's intention to cause AMF and
> similarly situated businesses within the City poten-
> tially irreparable harm, potentially driving them out
> of business in the City of Chamblee, we request that
> the Denial Letter be immediately rescinded.

The next day, Bergthold wrote back to Bowlmor and suggested that they request a hearing, noting that by requesting a hearing, Bowlmor could continue to serve alcohol until the hearing officer decided the case. Bowlmor appealed the decision, and a hearing was set for March 5, 2020. Bowlmor's counsel responded to the notification on the hearing date and asked, "When can we get together to discuss a way out of this mess?" On February 19, 2020, Bowlmor's counsel requested a continuance on the hearing, and the hearing never occurred. On February 28, 2020, City Clerk Niethammer entered a proposed amendment to the City's alcohol code that would create a new permit premise—bowling centers. The City Council passed the proposed amendment, which states that bowling centers applying for an alcohol license must derive more than 50% of their revenues from the rental of bowling lanes and equipment and sale of prepared meals. The adopted amendment also changed the time in which an establishment has to wait to reapply upon failing to receive a license, decreasing the time from one year to three months. Bowlmor never had to cease its alcohol sales.

### F. The City Denies Follies' 2020 Business License and 2020 Alcohol License

On August 21, 2020, the City denied Follies' 2020 Occupation Tax Certificate application, which allows businesses to operate within the City. The application was denied for three reasons: (1) Follies sold alcoholic beverages for consumption on the premises despite being ineligible for an alcohol license because it failed to meet the 50 percent revenue requirement; (2) Follies operated in direct violation of the ban on alcohol consumption at adult establishments; and (3) the City's ordinances state that no alcohol license shall be granted for any adult establishment. Officials determined that Follies was not authorized to operate within the City. Follies appealed this decision within 15 calendar days by filing a notice of appeal with the City Manager, and a hearing was held on October 1, 2020. The decision to deny Follies' Occupation Tax Certificate was upheld at that hearing, and Follies did not challenge that decision further. The same day, the City denied Follies' 2020 alcohol license because Follies is a semi-nude lounge, Follies failed to meet the 50 percent food requirement, and Follies failed to furnish all the necessary information required to apply.

### G. Follies Closes

Throughout 2019 and for the first few months of 2020, Follies continued selling alcohol and offering nude dancing to patrons in violation of the challenged ordinances. In October 2019, the City filed a state court action against Follies (while this case was pending in the district court), seeking an injunction compelling Follies to

comply with the two challenged ordinances. On March 21, 2020, Follies closed under the City's COVID-19 order, and on July 8, 2020, the state court enjoined Follies from violating the challenged ordinances. On July 1, 2020, COVID-19 restrictions were lifted for live performances. Follies is now permanently closed and has lost its lease.

### H. Follies Files Suit

Follies sued the City in the district court challenging the constitutionality of the City's ordinances and seeking to enjoin the enforcement of the ordinances, "which have the purpose and effect of eliminating adult entertainment in the City of Chamblee." Follies moved for a preliminary injunction. The City answered, moved to dismiss the complaint for lack of standing, and responded to the preliminary injunction motion. The district court denied Follies' preliminary injunction motion, deferred the motion for judgment on the pleadings, and granted in part the City's motion to dismiss. Regarding the motion to dismiss, the district court held that Follies lacked standing to challenge the no-touch and nudity rules in Alcohol Code § 6-14(c) because those apply only to alcohol licensees, which, given the City's determination, Follies was not.

Follies filed a second amended complaint, which asserted 12 counts. Follies brought claims for (1) violations of the First and Fourteenth Amendments; (2) injunctive relief for federal free speech violations; (3) violations of the free speech clause of the Georgia Constitution; (4) injunctive relief for state free speech violations; (5) impairment of contract in violation of the Contract

Clause; (6) injunctive relief for federal impairment of contract; (7) impairment of contract in violation of the Georgia Constitution; (8) injunctive relief for state impairment of contract; (9) a declaration that the City's Alcohol Code violates the First and Fourteenth Amendments as unconstitutionally vague; (10) injunctive relief for an unconstitutional alcohol code; (11) violations of the Equal Protection Clause; and (12) damages for constitutional violations. The City answered the second amended complaint and counterclaimed for injunctive relief to enjoin Follies from selling alcohol without a license and from allowing nudity and other illegal conduct on its premises.

## I.   Cross-Motions for Summary Judgment

After discovery, the parties cross-moved for summary judgment. Follies moved for partial summary judgment on its free speech, Contract Clause, and equal protection claims, and the City moved for summary judgment on all of Follies' claims.

The district court granted the City's motion in its entirety. In its order, the district court addressed general categories of constitutional claims in turn, starting with Follies' free speech claims. Follies argued that the challenged ordinances violated its freedom of speech guaranteed by the U.S. Constitution and the Georgia Constitution. The district court applied the secondary-effects doctrine outlined in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), and *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 448 (2002), and reviewed the ordinances under intermediate scrutiny. The court applied the three-part test outlined in *Peek-A-Boo*

*Lounge of Bradenton, Inc. v. Manatee County* (*Peek-A-Boo I*), 337 F.3d 1251, 1264 (11th Cir. 2003), to test the constitutionality of the ordinances.

Working through the test, the district court made the following determinations: First, the cumulative effect of the challenged ordinances was not a total ban on protected, expressive conduct. Because the ordinances did not "ban erotic dancing, but rather totally nude dancing in an adult entertainment establishment," it merely regulated the manner of presentation of the erotic message. And with respect to the alcohol bans, the district court noted that "[w]e are unaware of any constitutional right to drink while watching nude dancing." (quoting *Sammy's of Mobile, Ltd. v. City of Mobile*, 140 F.3d 993, 999 (11th Cir. 1998)). Second, when determining whether to apply strict or intermediate scrutiny, the district court asked whether the government intended to regulate the adult entertainment because of the speech's conduct or because of the need to combat secondary effects. The district court found that the City's goal of preventing "the deleterious secondary effects associated with sexually oriented businesses—including criminal activity" was well-documented and codified in the challenged ordinances themselves. Thus, the City met its burden under the *Renton* framework to justify intermediate, and not strict, scrutiny. And third, the district court found that "Chamblee has articulated a substantial government interest and permits adequate alternative channels of communication, *i.e.*, semi-nude erotic dancing." Given that analysis, the district court determined that the City's ordinances pass constitutional muster under *Renton/Alameda Books*.

The district court also addressed two arguments Follies made in an effort to avoid the *Renton/Alameda* secondary-effects framework. Follies argued that strict scrutiny should apply because the City possessed an illicit motive of targeting and shutting down strip clubs. The district court rejected this argument, because while the evidence showed that the City was aware of pending litigation and strip club closings in surrounding areas, that did not imply that the City acted with the intent to shut down Follies. Next, Follies argued that the Supreme Court's decision in *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), compels the application of strict scrutiny. The district court rejected this argument because *Reed* did not overrule the secondary-effects doctrine, given that *Reed* addressed sign restrictions and did not involve secondary-effects legislation. The district court also declined to address the ordinances' effects on Follies' economic viability, citing *Renton*'s holding that the First Amendment is not concerned with economic consequences. In sum, the district court applied intermediate scrutiny under the secondary-effects doctrine and found that the challenged ordinances were permissible regulations. The district court therefore granted summary judgment to the City on all of Follies' free speech claims.

The district court then turned to Follies' impairment of contract claims. Follies argued that the challenged ordinances substantially impaired the amended Agreement it executed with DeKalb County before the land annexation by the City. The district court dispensed with Follies' arguments for one simple reason—there was no valid contractual relationship with the City. Without a

contract, the district court found that there could be no claim for impairment of contract. Thus, the district court granted summary judgment to the City on all of Follies' Contract Clause claims.

Next, the district court addressed Follies' First and Fourteenth Amendment challenges to Ordinance 754. Follies argued that Ordinance 754's requirements of a 50 percent revenue calculation for an establishment to qualify as a restaurant were unconstitutionally vague. The district court determined that Ordinance 754 unambiguously articulates what an establishment must do to qualify as a restaurant and is not unconstitutionally vague. Therefore, the district court granted summary on Follies' void-for-vagueness challenge.

The district court then discussed Follies' equal protection claims. Follies argued that the City violated the equal protection provisions of both the U.S. and Georgia Constitutions. The district court rejected Follies' claim that the City of Chamblee selectively enforced the restaurant qualification requirements of Ordinance 754. Although the district court could not determine whether Follies articulated a selective enforcement claim based on alleged racial discrimination or a "class-of-one" theory, it determined that both tests would result in Follies losing because it had not shown a similarly situated comparator. Follies presented Bowlmor as a comparator, but the district court disagreed. First, the district court noted that one is a bowling alley and the other is a strip club. Second, Follies is categorically prohibited from applying for an alcohol license because it is a strip club—Bowlmor is not subject to that

restriction.  Finally, Bowlmor does not engage in the practice of pairing food items with alcohol.  Because of this, the district court granted summary judgment in the City's favor on the Equal Protection claims.

Finally, the district court dismissed without prejudice the City's two counterclaims seeking injunctive relief, because the parties were litigating substantially similar issues in a parallel state court action and because the federal claims were dismissed before trial.

The district court issued a final judgment for the City, and Follies timely filed this appeal.

## II.    STANDARD OF REVIEW

We review *de novo* the resolution of cross-motions for summary judgment.  *Ramji v. Hosp. Housekeeping Sys., LLC*, 992 F.3d 1233, 1241 (11th Cir. 2021).  We therefore apply the same legal standard used by the district court in considering these motions, drawing all inferences in the light most favorable to the non-moving party and recognizing that summary judgment is only appropriate when there are no genuine issues of material fact.  *Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525, 530 (11th Cir. 2013).  We review the dismissal of a complaint *de novo*, *Glynn Env't Coal., Inc. v. Sea Island Acquisition, LLC*, 26 F.4th 1235, 1240 (11th Cir. 2022), as well as issues of standing, *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1349 (11th Cir. 2009).

### III.    ANALYSIS

Follies makes four arguments on appeal.  First, Follies argues that the district court erred in concluding that Follies lacked standing to challenge the anti-nudity rules applicable to alcohol licensees.  Second, Follies argues that the district court erred in upholding Ordinance 752 and Ordinance 754 against a First Amendment challenge.  Third, Follies argues that the district court erred in determining that the challenged ordinances did not violate the Contract Clause of the U.S. Constitution.  Finally, Follies argues that the district court erred in granting summary judgment on the equal protection claims.  The City contends that the district court did not err, and that Follies' claims are now moot.  We begin by addressing whether Follies has standing to pursue its case.

### A.  Standing

It is well established that "[u]nder Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990).  Article III standing is one of several doctrines that enforce that case-or-controversy requirement. *E.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 492–93 (2009).  To have Article III standing, a plaintiff must have suffered an injury in fact that can be fairly traced to the defendant's conduct and that can be redressed with a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  We look to three elements to determine whether a plaintiff has standing: (1) injury in fact, (2) causation, and (3) redressability. *Id.*  "As the party invoking federal jurisdiction, the plaintiffs bear the

burden of demonstrating that they have standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021).

The analysis differs depending on whether a plaintiff is seeking declaratory and injunctive relief or damages. *Id*. at 431. We therefore address Follies' claims for equitable relief before turning to its claims for damages.

### i.    Follies lacks standing to sue for equitable relief because it is permanently closed and has no plans to reopen.

To establish an injury in fact, the plaintiff must demonstrate that he suffered a violation of a legal interest that is "(a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1113 (11th Cir. 2021) (quoting *Lujan*, 504 U.S. at 560). When the plaintiff seeks equitable relief, they must show that a future injury is imminent. *Id.* Because Follies seeks equitable relief, the injury analysis turns on whether it will suffer some "future harm," not whether it has suffered some "past harm." *Koziara v. City of Casselberry*, 392 F.3d 1302, 1306 (11th Cir. 2004); *see also Adler v. Duval Cnty. Sch. Bd.*, 112 F.3d 1475, 1477 (11th Cir. 1997) ("Equitable relief is a prospective remedy, intended to prevent future injuries.").

Follies cannot establish that it will suffer future harm because it concedes in its opening brief that "Follies is now permanently closed and has lost its lease." Resisting this conclusion, Follies complains that "the fact that it lost its lease does not prevent Follies from reopening at a different location." Yet without any plans to reopen at a different location, Follies' "speculation" cannot

21-12776                Opinion of the Court                27

satisfy Article III, *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 285 (2001), which requires that a claim for equitable relief be accompanied by a "continuing, present injury or real and immediate threat of repeated injury," *Cotterall v. Paul*, 755 F.2d 777, 780 (11th Cir. 1985) (quoting *Dudley v. Stewart*, 724 F.2d 1493, 1494 (11th Cir. 1984)).  We thus conclude that Follies lacks standing to pursue equitable relief.

> ### ii.    *Follies has a redressable claim for damages for the injuries it suffered during the time between when the state court enjoined Follies from violating the challenged ordinances and when the City denied its Occupational Tax Certificate.*

That finding does not preclude Follies, however, from meeting Article III standing requirements on its claims for damages.  *See Adler*, 112 F.3d at 1477 ("[A] claim for money damages looks back in time and is intended to redress a past injury.").  When a plaintiff seeks damages, courts consider whether an alleged past harm occurred to satisfy the injury requirement.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).  Here, the past injury is straightforward.  Follies suffered the loss of the economic use of their property.  *See TransUnion LLC*, 594 U.S. at 425 ("If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III.").  And this injury is traceable to the alleged constitutional violations.  The redressability of Follies' damages, however, is less certain.

When a plaintiff's alleged injury stems from their inability to use their property for a particular activity, that injury is not redressable where other, unchallenged regulations prohibit that same activity. *KH Outdoor, LLC v. Clay County*, 482 F.3d 1299, 1303 (11th Cir. 2007) (holding that a plaintiff failed to suffer a redressable injury when "other statutes and regulations not challenged" prohibited the same activity as the challenged regulation). If an alternative, unchallenged regulation prohibited Follies from using its property to present adult entertainment, stay open past midnight, and sell alcohol—the same activities that the challenged regulations prohibit—then a favorable decision by this Court would not redress that injury, as Follies would remain in the same position. The question, then, is whether unchallenged regulations prohibited Follies from using its property to present adult entertainment, stay open past midnight, and sell alcohol at the same time that the challenged regulations prohibited those activities.

As for selling alcohol, the answer is yes—other, unchallenged regulations prohibited Follies from selling alcohol at the same time as the challenged regulations prohibited that conduct. Businesses in the City cannot sell alcohol without a license. A Georgia Hearing Officer denied Follies' applications for an alcohol license in 2019 and 2020 because Follies failed to derive more than 50 percent of its total revenue from the sale of food and nonalcoholic beverages, in violation of Ordinance 754. When Georgia administrative bodies decide a question of fact, this Court gives that decision "preclusive effect" if the parties had an adequate opportunity to litigate that question of fact. *Travers v. Jones*, 323 F.3d

1294, 1296 (11th Cir. 2003).  Although Follies does not argue that it had an inadequate opportunity to litigate whether it satisfied the 50 percent requirement before the Georgia Hearing Officer, it tries to relitigate that question now, contending that it "was fully capable of qualifying as a restaurant under the city's alcohol code."  Follies is mistaken.  The factual dispute around Follies' revenue and kitchen capabilities is not for this Court—or the district court—to decide, as that question of fact has already been decided twice by the relevant local authority.  As a result, Follies' failure to satisfy the 50 percent food sales requirement is settled before this Court.

Although Follies challenged the constitutional validity of the food sales requirement as vague and discriminatory before the district court, it abandoned those arguments on appeal.  Now, instead of challenging the validity of the food requirement rule, Follies argues that it can meet that requirement.  In doing so, Follies exposes its own jurisdictional defect because Follies' argument supporting its claim for past damages depends upon relitigating factual determinations that we must give preclusive effect to.

In sum, then, Follies does not (and cannot) challenge the Georgia Hearing Officer's determination that Follies fails to satisfy the 50 percent food sales requirement.  The upshot of Follies' failure to challenge that determination is that it cannot obtain a license to sell alcohol, even if it successfully challenges every other provision in the City's Code that prohibits it from selling alcohol.  For example, Section 6-45(j) of the Alcohol Code singles out adult establishments and renders them ineligible for alcohol licenses.  Even

if Follies successfully challenges that provision, Follies cannot obtain a license to sell alcohol because we must give preclusive effect to the Georgia Hearing Officer's determination that Follies failed to satisfy the 50 percent food sales requirement. Put simply, Follies cannot obtain a license to sell alcohol. And without that license, Follies cannot sell alcohol.

At the same time, Follies used its property for more than selling alcohol. It also offered adult entertainment and stayed open past midnight. And having its application for an alcohol license denied does not, by itself, prohibit Follies from offering adult entertainment and staying open past midnight. Instead, it's the challenged ordinances that prohibit that conduct. Sections 22-101 and 22-115(a) prohibit Follies from offering fully nude dancing. Plus, Section 22-118 requires that adult establishments close for business at midnight. Those three provisions apply even if a business lacks an alcohol license. So to the extent those provisions caused Follies' injury, that injury is redressable.

Contending otherwise, the City points to the denial of Follies' Occupation Tax Certificate and argues that, because of that denial, none of Follies' claims for damages are redressable. Under Section 22-3(c) of the City's Code, an "occupation tax certificate shall service as a business license." Section 22-2(b), in turn, defines a business license to mean "a permit or certificate issued by the city that allows an entity to operate lawfully in the city." As a result, the denial of Follies' Occupation Tax Certificate prohibited it from operating altogether. And because Follies does not challenge that

denial, it does not have a redressable claim for any damages it incurred after the denial occurred.

But the City denied Follies' Occupation Tax Certificate on August 21, 2020. And the state court injunction, which forced Follies to comply with the challenged ordinances, issued on July 7, 2020. That leaves forty-five days during which Follies was subject to the state court injunction and retained its Occupation Tax Certificate. During those forty-five days, in other words, Follies could have offered adult entertainment and stayed open past midnight—but for the state court injunction that forced Follies to comply with the challenged ordinances. As a result, Follies has a redressable claim for damages it suffered during that forty-five-day period. Because Follies has standing for this forty-five-day period, we address the merits of its claims. We turn first to its free-speech claims.

## B. Free Speech

On appeal, Follies argues that the district court erred in granting summary judgment on its free speech claims. Particularly, Follies argues that the district court should have applied strict scrutiny when determining the constitutionality of Ordinance 752 and Ordinance 754 because: (1) the predominate purpose of the City's laws is to suppress speech and (2) the Supreme Court's decision in *Reed* subjects this kind of content-based restriction to strict scrutiny. (*Id.*) Finally, Follies argues that even if intermediate scrutiny applies, the laws are still unconstitutional.

"Content-based restrictions on speech normally trigger strict scrutiny." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1308 (11th

Cir. 2017) (en banc).  Yet, under well-established precedent, adult-entertainment ordinances are not treated like other content-based regulations.  *Peek-A-Boo I*, 337 F.3d at 1264.  When analyzing public-nudity ordinances, we first ask whether the government's purpose in enacting the ban on public nudity relates to the suppression of the erotic message conveyed by nude dancing; if so, strict scrutiny applies.  *Flanigan's Enters., Inc. of Ga. v. Fulton County* (*Flanigan's I*), 242 F.3d 976, 983 (11th Cir. 2001).  If, however, the ban is motivated by some other purpose, then the test laid out in *United States v. O'Brien*, 391 U.S. 367, 376–77 (1968), applies.  *Flanigan's I*, 242 F.3d at 983.  In that circumstance, intermediate scrutiny applies and "an ordinance is valid if: (1) it serves a substantial interest within the power of the government; (2) the ordinance furthers that interest; (3) the interest served is unrelated to the suppression of free expression; and (4) there is no less restrictive alternative." *Flanigan's I*, 242 F.3d at 984.

Follies argues that the Supreme Court's decision in *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), changed the secondary-effects doctrine such that it no longer controls in this case.  In *Reed*, the Supreme Court reversed a decision that applied a lower level of scrutiny to a municipal sign code that treated signs differently depending whether they fit into certain categories, including "ideological," "political," or "temporary directional."  *Reed*, 576 U.S. at 159–160.  Ruling that strict scrutiny should have applied, the *Reed* court found that "[g]overnment regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  *Id.* at 163.  The Court

also rejected the idea that a government's motive could change this analysis—"[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* at 165 (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)). Although *Reed* has perhaps called into question the reasoning underlying the secondary-effects doctrine, it did not overrule it; indeed, *Reed* did not purport to address the secondary-effects doctrine. Without further clarification, we cannot disregard well-established precedent. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other lines of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); *see also, e.g.*, *BBL, Inc. v. City of Angola*, 809 F.3d 317, 326 n.1 (7th Cir. 2015) ("We don't think *Reed* upends established doctrine for evaluating regulation of businesses that offer sexually explicit entertainment, a category the Court has said occupies the outer fringes of First Amendment protection.").

Follies also argues that intermediate scrutiny under the secondary-effects doctrine does not apply because the City's predominant purpose is to suppress speech and is thus subject to strict scrutiny. An aggrieved party may challenge an ordinance that relies on the secondary-effects doctrine "either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings."

*Peek-A-Boo I*, 337 F.3d at 1265 (quoting *Alameda Books*, 533 U.S. at 438–39).  When an ordinance is challenged in that way, we ask whether the municipality demonstrated that the purpose of the ordinances is "to combat negative secondary effects of adult businesses." *Zibtluda, LLC v. Gwinnett County*, 411 F.3d 1278, 1285 (11th Cir. 2005).  "The evidentiary threshold the [city] faces in establishing this purpose is not high." *Id.* at 1286.  The municipality "must cite to *some* meaningful indication—in the language of the code or in the record of legislative proceedings—that the legislature's purpose in enacting the challenged statute was a concern over secondary effects rather than merely opposition to proscribed expression." *Id.* (quoting *Ranch House, Inc. v. Amerson*, 283 F.3d 1273, 1283 (11th Cir. 2001)).  The City's ordinances meet this burden.  The City Council cited to the experiences of other cities, studies on the effects of adult establishments on crime, expert testimony, and testimony of local officers to support their findings, which are laid out in the language of the challenged ordinances.

Follies also argues that the City's purpose was not to combat the harmful effects of adult speech, but rather to censor Follies because the challenged ordinances were adopted with the knowledge that they would close Follies.  Follies alleges that the City modeled its ordinances after similar laws that were passed, and then successfully defended, in neighboring cities.  Also, according to Follies, the City tracked that litigation to ensure its own ordinances would ultimately eliminate Follies' business model.  Follies cannot rebut Chamblee's secondary-effects rationale with evidence "of an alleged illicit motive." *Zibtluda*, 411 F.3d at 1288 (quoting *City of*

*Renton*, 475 U.S. at 48). Rather, Follies must "challenge the secondary effects rationale 'either by demonstrating that the municipality's evidence does not support its rationale, or by furnishing evidence that disputes the municipality's factual findings.'" *Id*. (quoting *Peek-A-Boo I*, 337 F.3d at 1265). Follies has done neither.

And under the secondary-effects doctrine outlined in *Renton* and *Alameda Books*, the City's ordinances pass constitutional muster. First, the ordinances do not amount to a total ban on protected, expressive conduct. Although barred from showing completely nude dancing and serving alcohol, dancers at Follies would be free to engage in semi-nude, erotic performances. *See Fly Fish, Inc. v. City of Cocoa Beach*, 337 F.3d 1301, 1308 (11th Cir. 2003) ("If the message of nude dancing is eroticism, then [the challenged law] may properly be characterized as a *Renton*-type of time, place, or manner regulation. It does not ban erotic dancing, but rather totally nude dancing in an adult entertainment establishment.") Second, because the ordinances intended to combat the secondary effects, intermediate scrutiny applies. Finally, as the ordinance is subject to intermediate scrutiny, the Court must determine whether the ordinances are "designed to serve a substantial government interest and allow[] for reasonable alternative channels of communication." *Peek-A-Boo I*, 337 F.3d at 1264. The City has shown a substantial government interest in decreasing property crime, prostitution, sexual assault, and violence around the adult establishment in its community while still permitting alternative channels of communication, mainly semi-nude erotic dancing. We thus conclude that the City's ordinances do not violate the First Amendment, and

we affirm the district court's grant of summary judgment for the City on Follies' free speech claims.

### C.  Contract Clause

Follies alleges that the challenged ordinances substantially impaired the amended Agreement it executed with DeKalb County before the land annexation by the City.  The district court concluded that the City was entitled to summary judgment because there was no valid contract between the City and Follies.

The Contract Clause of the U.S. Constitution provides that "No States shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § X.  To determine when a law crosses the constitutional line, the Supreme Court has "long applied a two-step test." *Sveen v. Melin*, 584 U.S. 811, 819 (2018).  The first step is whether the state law has "operated as a substantial impairment of a contractual relationship." *Id.* (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)).  "In answering that question, the Court has considered the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Id.*  Meeting this first step requires three elements: (1) a contractual relationship; (2) a change in law that impairs that contractual relationship; and (3) a substantial impairment. *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992).  If the first step of the test is met, the court then asks "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Sveen*, 584 U.S. at 819

(quoting *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411–12 (1983)).  The Georgia Constitution similarly restricts governments from impairing contracts, and the claims under Georgia and federal law can be treated the same.  *See All Star, Inc. v. Ga. Atlanta Amusements, LLC*, 332 Ga. App. 1, 8 (2015).

Follies fails the first step of the Contract Clause analysis— whether DeKalb County could bind itself and its successors to continue allowing Follies to operate as it did at the time of the Agreement.  It could not.

The Georgia Supreme Court has articulated one reason for this limitation.  DeKalb County is a political subdivision of Georgia, and its "capacity to contract" is determined by Georgia law.  *See DeKalb County v. Atlanta Gas Light Co.*, 228 Ga. 512, 513 (1972) (explaining that, under the Georgia Constitution, "counties can exercise only such powers as are conferred on them by law, and a county can exercise no powers except such as are expressly given or necessarily implied from express grant of other powers").  In *Trop, Inc. v. City of Brookhaven*, 296 Ga. 85, 88 (2014), the Georgia Supreme Court held, in a similar case brought by an adult establishment against a newly incorporated city, that the aggrieved party could not use an agreement with DeKalb County to bind the successively incorporated city.  This fact "undermine[d] [the business's] erroneous arguments that it had some vested right to continue operation as a nude dancing club that serves alcohol."  *Id.* at 89.  The same reasoning applies here.  Without a valid contract, we conclude that this claim by Follies fails, and we affirm the district

court's grant of summary judgment on Follies' Contract Clause claims.

### D. Equal Protection

Follies, next, argues that the City violated its equal protection rights under the U.S. Constitution and the Georgia Constitution. The district court concluded that the City was entitled to summary judgment because Follies failed to present a similarly situated comparator.

In relevant part, the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. Similarly, Article I, section 1, paragraph 2 of the Georgia Constitution provides that "[n]o person shall be denied the equal protection of the laws." Follies' federal and state equal protection claims are governed by the same standards. *See Williams v. Fulton Cnty. Sch. Dist.*, 181 F. Supp. 3d 1089, 1136 (N.D. Ga. 2016) ("The Equal Protection Clause of the Georgia Constitution is coterminous with that of the federal constitution, and so the same analysis applies to Plaintiff's state and federal equal protection claims."); *see also Nodvin v. State Bar of Ga.*, 273 Ga. 559, 559–60 (2001). The unequal application of a facially neutral statute may violate the Equal Protection Clause. *Strickland v. Alderman*, 74 F.3d 260, 264 (11th Cir. 1996). To prevail on this kind of "class-of-one" equal protection claim, plaintiffs must show "(1) that they were treated differently from other similarly situated individuals, and (2) that Defendant unequally applied a facially neutral ordinance for the purpose of discriminating against

Plaintiffs." *Campbell v. Rainbow City*, 434 F.3d 1306, 1314 (11th Cir. 2006). "To be 'similarly situated,' the comparators must be 'prima facie identical in all relevant respects.'" *Grider v. City of Auburn*, 618 F.3d 1240, 1264 (11th Cir. 2010) (emphasis omitted) (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1204 (11th Cir. 2007)).[4]

Follies identifies Bowlmor as the relevant similarly situated comparator. In 2019, the City denied Follies' alcohol license for several independent reasons, including because Follies failed to meet the 50% food requirement to qualify as a restaurant *and* because Follies was an adult establishment, rendering it ineligible for an alcohol license under the City's laws. That same year, the City granted Bowlmor's alcohol license, even though Bowlmor failed to meet the 50 percent food requirement to qualify as a restaurant. The City Clerk testified that shortly before her November 6, 2019, deposition she learned that Bowlmor's license was issued in error. On appeal, Follies asserts that it and Bowlmor "are identical, contrary to the court's conclusion, because the *only* relevant material fact is whether each satisfied the 50% food requirement to obtain an alcohol license." (emphasis in original).

Despite Follies' contention, Bowlmor is not a similarly situated comparator identical to Follies in all relevant respects. At the outset, we note that when a "challenged governmental decision[ ]" is "one-dimensional," involving "a single answer to a single

---

[4] As the district court explained in its order, Follies did not clearly articulate whether its selective-enforcement claim was premised on a "class-of-one" theory.

question," courts can "analyze the 'similarly situated' requirement succinctly and at a high order of abstraction." *Griffin Indus.*, 496 F.3d at 1203. By contrast, where "the government's regulatory action [is] undeniably multi-dimensional, involving varied decisionmaking criteria applied in a series of discretionary decisions made over an extended period of time," courts "cannot use a simplistic, post-hoc caricature of the decisionmaking process." *Id.* This kind of "multi-dimensional" assessment relies on "the full variety of factors that an objectively reasonable governmental decisionmaker would have found relevant in making the challenged decision." *Id.* Thus, in those cases, "similarly situated entities 'must be very similar indeed.'" *Id.* at 1205 (quoting *McDonald v. Village of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004)).

It is clear that Follies and Bowlmor, its purported comparator, have marked differences. As the district court put it, "Follies is a strip club that offers live nude dancing. Bowlmor is a bowling alley." In light of these obvious differences, it would not be an equal-protection violation for a government to apply different alcohol-licensing regimes to each establishment, nor to evaluate the risks of each establishment differently in a "multi-dimensional" assessment.

However, it is less clear to us that the obvious differences between the two insulate the government from an equal-protection claim with respect to the application of the 50 percent revenue requirement under the Chamblee Code. That requirement is effectively "one-dimensional," asking a "single question" with a

"single answer." *Id.* And we are unaware of any case holding that a plaintiff's equal-protection claim alleging differential application of this kind of standard fails because of a purported comparator's distinctive features that *could* be relevant to a government decision but were not part of a standard spelled out in law.

Regardless, we need not resolve this issue here, because Follies was not in fact similarly situated to Bowlmor even with respect to the 50 percent revenue requirement. Follies does not dispute that, when the City denied its 2019 alcohol license, the City knew that the club had used accounting and sales gimmicks to inflate its purported food sales. By contrast, we have no indication that Bowlmor engaged in such tricks. The City had less detailed information on Bowlmor's practices, and the bowling alley's situation was essentially the inverse of Follies': The face of Bowlmor's application demonstrated that it too failed the 50 percent requirement, but the City nevertheless granted its license "by mistake."[5] So, even on the single "dimension" of food sales, Follies and Bowlmor were not similarly situated, defeating the former's equal-protection claim.

Follies also points to Bowlmor's discussions with the City after the 2020 license denial in an attempt to delay the hearing and work with the council to adopt an ordinance to allow Bowlmor to

[5] There is no record evidence that the 2019 grant of Bowlmor's license was anything other than a mistake. Indeed, the City denied Bowlmor's 2020 license application for the same reason that it denied Follies' license in 2019— failure to meet the 50 percent food requirement.

remain open.  But Bowlmor's post-denial interaction with the City only serves to further distinguish Bowlmor from Follies and confirm that the two are not similarly situated.  Not only did Follies not seek to delay the hearing on the 2019 license denial, which would have enabled it to continue serving alcohol, but Follies did not even show up at its appeal hearing.  As to the proposed and adopted ordinance change relating to Bowlmor, the City's legislative response is explained by the differences between the business models of the two establishments.

In sum, we conclude that Follies has failed to show that the City violated the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution or the Equal Protection Clause of Georgia's Constitution.  We thus affirm the district court's grant of summary judgment for the City of Chamblee on Follies' equal protection claims.

## IV.    CONCLUSION

For these reasons, we affirm the decision of the district court.

**AFFIRMED.**

21-12776                ROSENBAUM, J., Concurring                1

ROSENBAUM, Circuit Judge, Concurring:

I concur with the majority opinion in full. I write separately simply to note that our decision breaks no new ground on the power of Georgia counties to enter binding contracts.

Follies alleged that the City's challenged ordinances violate the U.S. Constitution's Contract Clause. But the Georgia Supreme Court's decision in *Trop, Inc. v. City of Brookhaven*, 764 S.E.2d 398, 402 (Ga. 2014), forecloses that claim. The highly analogous facts in that case establish that Follies lacks a relevant contractual relationship with the City.

To be clear, though, *Trop* doesn't suggest that Georgia counties can *never* contractually bind themselves or later-incorporated municipalities. Indeed, two doctrines help define the circumstances when a government may contract away some of its powers.

The first is the "reserved powers" doctrine. Powers that resemble mere financial transactions—taxing and spending—can be "contracted away"; those that are "essential attribute[s]" of sovereignty—like the police power and the power of eminent domain—cannot be. *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 23–24 (1977).

Second is the "unmistakability" doctrine. It creates a clear-statement rule for government contracts touching on sovereign powers: "neither the right of taxation, nor any other power of sovereignty, will be held . . . to have been surrendered, unless such surrender has been expressed in terms too plain to be mistaken."

*United States v. Winstar Corp.*, 518 U.S. 839, 874–75 (1996) (quoting *Jefferson Branch Bank v. Skelly*, 66 U.S. (1 Black) 436, 446 (1862)).

Because *Trop* is directly on point, we had no need to further consider Georgia counties' contracting powers in light of these or other doctrines.